254 F.Supp. 47 (1966)
ST. LOUIS TESTING LABORATORIES, INC., a corporation, Plaintiff,
v.
MISSISSIPPI VALLEY STRUCTURAL STEEL COMPANY, a corporation, Defendant.
No. 65 C 126(3).
United States District Court E. D. Missouri, E. D.
April 7, 1966.
*48 *49 Robert H. McRoberts, Jr., and Stephen M. Boyd, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for plaintiff.
John P. Emde, Armstrong, Teasdale, Roos, Kramer & Vaughan, St. Louis, Mo., for defendant.
REGAN, District Judge.
This action was timely removed from the Circuit Court of the County of St. Louis. Plaintiff, St. Louis Testing Laboratories, Inc., seeks judgment against Mississippi Valley Structural Steel Company in the sum of $23,423.38 and interest, the balance claimed to be due for labor, services and materials allegedly furnished to defendant during the years 1962, 1963 and 1964.
Plaintiff is a Missouri corporation, whose principal place of business is in Missouri, and defendant is an Illinois corporation having its principal place of business in Illinois. This court has jurisdiction because of diversity of citizenship and amount in controversy.
St. Louis Testing Laboratories, Inc. is engaged in the business of performing metallurgical testing, including radiographic inspection and magnetic particle inspection of welding. Mississippi Valley Structural Steel Company fabricates and welds structural steel for various construction projects. The controversy between the parties arises out of one such project, the Chain-of-Rocks Bridge across the Mississippi River, between the City of St. Louis, Missouri, and Madison County, Illinois, which was erected under contract with the State of Missouri acting through the State Highway Commission of Missouri. The specific project (designated I-270-5 (72) 242) covers the construction of the structural steel superstructure spans (except the concrete deck and metal handrail) of the bridge.
The bid proposal was required by the State Highway Commission of Missouri to include the following, set forth in the Special Provisions constituting part of the specifications:
"O. Radiographic Inspection (707). The Contractor shall furnish the equipment and personnel to make radiographic inspection of butt welds as required herein. The tension splices in flanges of built up girders shall be 100 percent radiographed and not more than 25 percent of the remainder of butt splices will be radiographed, except for unforeseen difficulties which may arise. Radiographic inspection shall be in accordance with ASTM Specification Designation E94, `Recommended Practice for Radiographic Testing'.
"All butt welds shall be 100% radiographic quality and shall be spot checked. Radiography shall also be used in connection with procedure qualification to insure that the materials, machines, methods and workmen are producing work of radiographic quality. Radiographs shall be made of each operator's work. The discovery of poor workmanship shall require additional radiographs of either the area of work showing defects or of other work done by the same operator whose work is not acceptable.
* * * * * *
"P. Magnetic Particle Inspection of Fillets Welds and Other Tests (708). *50 Magnetic particle inspection shall be made of shop fillet weld areas. The particle inspection of 25 percent of the primary stress carrying fillet welds in main member connections and 10 percent of the fillet welds in secondary and bracing members will be required. Such inspection shall be made by an established and approved laboratory whose equipment shall have a rated capactiy (sic) sufficient for the work to be done. The procedures and techniques shall be in conformance with the current ASTM Designation: E109, `Dry Powder Magnetic Particle Inspection.'"
Prior to January 15, 1963, Mr. Ray Sehrt, then plant engineer of defendant, requested plaintiff to furnish an estimate of the amount it would charge for doing the required radiographic and magnetic particle inspection work in connection with the project in the event the defendant was the successful bidder. Mr. C. D. Trowbridge, president of plaintiff, informed Sehrt that plaintiff was making such an estimate for Stupp Bros. Bridge & Iron Co. and would make the same charge to defendant. On January 15, 1963, plaintiff wrote defendant the following letter:
 "Mississippi Valley Structural Steel Co.
 3117 Big Bend Blvd.
 Maplewood 17, Missouri
 ATT: Mr. Ray Sehrt
Gentlemen:
We are, herewith, submitting the amount of our total fees for Radiographic Inspection and Magnetic Particle Inspection of weldment for the Chain-of-Rocks Bridge Project.
The total sum for inspection of the original welding is $25,321.68. (emphasis supplied).
 Very truly yours,
 C. D. Trowbridge, Director"
It appears that plaintiff furnished Stupp Bros. Bridge & Iron Co. a detailed estimate "in accordance with the discussion and our understanding of information submitted with your letter dated January 9, 1963." Defendant had no knowledge of this detailed estimate or the basis thereof nor the information which Stupp Bros. Bridge & Iron Co. had submitted to plaintiff.
Relying on the January 15th letter which submitted as the total fee for inspection of the original welding the sum of $25,321.68, defendant included the sum of $25,322.00 as the cost of the required inspection work in submitting its bid to the State Highway Commission. On January 18, 1963, defendant, as the low bidder, was awarded the contract for the bridge project. Thereafter (as of January 18, 1963) a written contract between defendant and State of Missouri acting through the State Highway Commission was executed for the fabrication of the steel superstructure of the bridge. In March, 1963, the State Highway Commission notified defendant to proceed with the work.
About June 8, 1963, Sehrt and Trowbridge had a meeting at which they discussed plaintiff's estimate of January 15, 1963, including a proposed scheduling of the work at defendant's Decatur and St. Louis plants. During the course of this meeting there was some discussion concerning Special Provision O, and the number of radiographs required thereby. At this June 8th meeting Sehrt and Trowbridge made a spot check of the specifications and plans in the various categories of the work to be performed, not for the purpose of determining the total number of required radiographs but primarily to enable defendant to schedule the work for its Decatur and St. Louis plants. Trowbridge indicated that he had figured that 1,441 radiographs (or "shots") were required in order to comply with Special Provision O. However, there was no understanding or agreement between the parties, nor any condition imposed by plaintiff, limiting the number of radiographs to be performed under plaintiff's proposal to that number or any other specific figure.
On June 11, 1963, plaintiff wrote another letter to defendant submitting a revised and more detailed proposal, stating *51 (as to radiographic inspection) that it "shall be performed on weldments per specifications in Paragraph O Radiographic Inspection (707) of the applicable specifications * * *". The letter continued, "The total number of radiographs of approximately 1500 plus additional radiographs for extra work up to a total of 100 shall be made for the sum of $8,646.00 with the understanding that the special shots will be available on regularly scheduled trips to your St. Louis Plant." The letter stated that the amount to be charged for "Magnetic Particle Inspection of the required welded seams as set forth in the specifications" would be the sum of $16,946.58.
Another meeting at which Sehrt and Trowbridge were present was held at defendant's plant on June 24, 1963, and following which, under date of June 25, 1963, Trowbridge again wrote a letter to defendant, referring to its "quotations dated January 15, 1963 and June 11, 1963 and also discussions of June 24, 1963 relative to Radiographic and Magnetic Particle Inspections of Weldments for the Chain-of-Rocks Bridge Project to be fabricated at your plants here in St. Louis, Missouri, or at Decatur, Illinois."
The letter continued, "This is to advise that we will perform this inspection per specifications for the total sum of $25,321.68 which will include all travel and living expenses at either or both of the St. Louis or Decatur Shops." (emphasis supplied).
Finally, on July 12, 1963, defendant sent to plaintiff its Purchase Order No. 1397E. This purchase order (stated to be "subject to the terms and conditions printed on the back" thereof) is in the following language:
"Furnish all equipment and personnel to perform radiographic inspection of butt Welds and Magnetic particle inspection of fillet Welds made in the St. Louis, Missouri and Decatur, Illinois shops for bridge superstructure. The radiographic inspection shall be in accordance with ASTM designation E94. The procedure and techniques shall be in conformance with the current ASTM designation E109."
"All work shall comply with the Standard Specifications of the Missouri State Highway Commission as well as the plans and Special Provisions of Project I-270 (72) 242 Route 1-270 City of St.Louis-Madison County, Illinois."
"It is understood that times of inspection shall accommodate the requirements of the respective shops."
"Please have your Insurance Company complete and return to us, in triplicate, the attached Certificate of Insurance on our standard form. The extra two copies are for your file and that of your Insurance Company."
"Refers to drawings 1 thru 37, Chain of Rocks Bridge (Mo. A-890), by Sverdrup and Purcel."
"Price to be $25,321.68 as quoted by Mr. C. D. Trowbridge on June 25, 1963." (Emphasis supplied).
Among the terms and conditions stated on the reverse side of the purchase order is the following:
"(9) The Subcontractor represents that before submitting its proposal it had examined the specifications and drawings constituting parts of the principal contract or contracts between the Owner and the Contractor. In so far as applicable to the work to be performed by the Subcontractor, all obligations imposed upon the Contractor by such principal contract or contracts shall be assumed and performed by the Subcontractor, and all determinations with respect to and interpretations of such principal contract or contracts, including such specification and drawings, which shall be made with respect to the Contractor's responsibilities thereunder shall be applicable to and binding upon the Subcontractor. If and to the extent that any of the terms and conditions herein are stated are inconsistent with any of the provisions of such principal contract or contracts or with any of such determinations or interpretations, *52 such provisions or such determinations or interpretations, as the case may be shall control."
Shortly after its receipt of this purchase order of July 12, 1963, plaintiff began to perform radiographs and magnetic particle inspections pursuant to such order.
In their respective briefs, the parties are in disagreement as to what contract was entered into between them, so much so as to initially present the question as to whether there ever was a meeting of the minds. Plaintiff contends that insofar as the contract related to the performance of radiographic inspection, the agreement was that plaintiff make a total of 1,500 radiographs together with a number not to exceed 100 additional radiographs for extra work, all "for the sum of $8,646.00". Defendant on the other hand urges that the contract, as to radiographs, obligated plaintiff to make the total minimum number of radiographs which were required in order to comply with the plans, drawings and specifications, including the Special Provisions, set forth in the contract with the State.
Our study of the evidence in this case, having due regard to the credibility of the witnesses, has convinced us that there was a meeting of minds and that the agreement obligated plaintiff to make the total minimum number of radiographs which were required by the bridge contract. We so find. To the extent that our finding involves the determination of credibility, we find the evidence adduced by defendant to outweigh, in respect to credibility, that of plaintiff.
It is clear that defendant was interested in obtaining a fixed price for the total minimum number of radiographic inspections which were required in order to comply with the contract, rather than for 1500 shots or any other number less than whatever number would be necessary under the terms of the bridge contract. The credible evidence demonstrates that persons knowledgeable in this field could, by making the necessary calculations based upon a study of the contract documents, determine with reasonable accuracy the total minimum number of shots which were required. We find from the evidence that the number of radiographs so required to comply with the plans, drawings and specifications is 2,644. True, the parties did not make this calculation in advance of the contract, and in any event it was unnecessary for defendant to do so, particularly in view of the fact that its primary interest was in obtaining a lump sum figure for the work.
We believe that the parties dealt with each other on the assumption that the total minimum number of required radiographs was capable of determination and computation from a study and inspection of the plans, specifications and drawings. That Trowbridge, for plaintiff, may have made an erroneous calculation of the number of shots required by reason of the unscientific manner in which he made his calculation, or possibly because he might have been misled by figures submitted to him by Stupp Bros. Bridge & Iron Co., was no fault of defendant.
We find no ambiguity in Special Provision O, and credit the expert testimony that this Provision created an obligation to radiograph 100 per cent of tension splices in built-up girders and 25 per cent of the compression flanges and web butt splices. Whatever the number of radiographs so required, such was the number the parties agreed upon, whether more or less than 1,500. That is certain which can be ascertained with certainty, and the minimum number of radiographs required to comply with Special Provision O could be determined with certainty.
If Trowbridge made a miscalculation, defendant was not responsible therefor and in no event should be penalized for any erroneous calculations he may have made. It was the obligation of plaintiff to study the plans and specifications before undertaking to perform in accordance therewith at a fixed price. It is simply not true that defendant ever agreed to limit the total number of radiographs to be performed by plaintiff under the contract to 1,500 (plus 100 for *53 retakes). There is no doubt in our mind that defendant's Purchase Order was intended to and does include, in addition to the magnetic particle inspections required by the bridge contract, the minimum total number of required radiographic inspections, all for the lump sum price of $25,321.68.
We agree with plaintiff's contention that "whether a contract was in fact made and what its terms were does not depend on what one of the parties understood or intended, but upon what was actually said and done between the parties." However, we are convinced, that whether or not Trowbridge may have been technically incompetent to properly determine the number of radiographic inspections which would be necessary under the bridge contract (and as a result may have underestimated the number of required radiographs), the agreed contract price of $25,321.68 included the performance of the total minimum number of shots which the Highway Department's specifications made necessary. We also are convinced that not even Trowbridge actually had any intention to limit the number of shots in the contract between the parties, but rather, at most, he mistakenly believed, on the basis of calculations to which plaintiff was not a party, that the specifications could be complied with by performing not more than 1,500 radiographs.
The Purchase Order outlines the essential terms of the contract between the parties, and to the extent to which it may be deemed inconsistent with any prior negotiations or communications, its terms must govern because it was the last offer and accepted and acted upon by plaintiff. All of the prior negotiations and writings, as well as the subsequent conduct of the parties have been considered for the purpose of throwing light upon the intentions of the parties and ascertaining their actual agreement. In this connection, plaintiff argues that although in its letter of June 25, 1963 it agreed to do the work "per specifications for the total price of $25,321.68", its reference to specifications does not include the Special Provisions.
Plaintiff's present construction of the language of its June 25th letter, if accepted, would drastically restrict and distort the ordinary meaning of the language, so much as to make it virtually meaningless. The bridge contract expressly provides that the Special Provisions supplement the standard specifications and in case of conflict the Special Provisions take precedence and govern. We hold that the Special Provisions do constitute part of the specifications and that plaintiff agreed to perform in accordance therewith for a total fixed price.
The burden is upon plaintiff to establish the essential facts necessary to prove its claim by the preponderance or greater weight of the credible evidence. Bakelite Co. v. Miller, Mo., 372 S.W.2d 867, 871. The complaint states plaintiff's claim as an action on account. In its Brief, plaintiff characterizes its action as one based in part on an express contract (as to the original work agreed upon) and in part on an implied contract (as to the additional work). The case was so tried. In any event, whatever the form of the action, it is evident, as we have found, that there was an express contract for the performance of the total minimum number of inspections required by the bridge contract, and to that extent plaintiff may not relieve itself of its obligations thereunder by the device of suing on an account. Plaintiff's contractual obligation was to perform, in addition to the required magnetic particle inspections, 2,644 radiographs for the total price of $25,321.68. The existence of an express contract does not preclude a party, after performance, from suing in quantum meruit for the reasonable value of the work and materials. However, if it does so, the contract price, although not controlling, is the maximum recoverable. Oliver L. Taetz, Inc. v. Groff, 363 Mo. 825, 253 S.W.2d 824, 829; Knoch v. Frye, Mo.App., 363 S.W.2d 737, 741.
*54 The parties are in essential agreement concerning the magnetic particle inspections. The Special Provisions, which constitute a part of the specifications, require magnetic particle inspections of 25 per cent of the lineal footage of primary fillet welds and 10 per cent of the lineal footage of secondary fillet welds. There is no dispute concerning the performance by plaintiff of all of the required work involving primary fillet welds, and it has also been agreed that plaintiff performed all but 5,200 feet of the required secondary weld inspections.
The contract as we have found it, required plaintiff to make 2,644 radiographs in addition to the magnetic particle inspections. The parties have stipulated that a total of 5,985 radiographs were made at the instance of defendant, which is 3,341 in excess of the total required under the contract. Of these, 954 admittedly resulted from rejects of welds and would not otherwise have been required. They are provided for in Special Provision O, but do not constitute a part of the total which plaintiff was obligated to make for the fixed fee. In its Brief, defendant concedes liability for the reasonable value of these 954 radiographs. However, defendant disputes its liability for the remaining 2,387 radiographs. We therefore consider the evidence relating to this issue.
Defendant and the State Highway Commission modified the bridge contract by substituting 100 per cent radiographic inspection on all butt splices on all girders for the unperformed portion of the magnetic particle inspection of secondary welds. Before these additional radiographs were performed by plaintiff, there were telephone discussions between Sehrt and Trowbridge wherein plaintiff agreed, at defendant's request, that it would substitute radiographic inspections for the omitted magnetic particle inspections. Trowbridge's version of the conversations was that he agreed to "exchange monies" in the event of such substitution of work, that is, that plaintiff would credit defendant with the monetary value of all magnetic particle inspections which the State waived against the cost of any additional radiographic inspections ordered by defendant which were not required under the terms of the existing contract. Sehrt, on the other hand, who talked only of "exchanging work" in the conversations, testified that he was of the impression that the additional radiographs, whatever the actual cost or value thereof might be, would be substituted, at no cost to defendant for the magnetic particle inspections which were to be deleted from the contract. The parties have agreed that the cost of the omitted magnetic particle inspections is $1,430.00.
An intercorporate memorandum, a copy of which was sent to Trowbridge, is relied on by defendant to support its contention that plaintiff was to make no charge for the additional radiographic inspections. In our opinion, this memorandum does not have and was not intended to have the conclusive effect which the defendant now attributes to it. The memorandum which is addressed to an employee of defendant, with copies to six other employees of defendant, reads as follows:
"Mr. D. B. Jenkins, Bridge Engineers, State of Missouri, advises in his letter of November 26, 1963 that the state is in agreement with our letter of November 13, 1963 suggesting that 100% radiographic inspection be made on all butt splices on all girders. In addition, the root pass weld on the Q.T. steel butt splices shall be magnafluxed by MVSS personnel (using St. Louis Testing Lab Company equipment) to insure against root pass cracking."
"In order to perform this additional work with no increase in contract price the state is waiving the magnetic particle inspection of the fillet molds in secondary and bracing members."
This memorandum was primarily intended for the use and information of defendant's employees. The reference *55 therein to "no increase in contract price" clearly pertains solely to the contract between the State of Missouri and defendant, and in any event Trowbridge was justified in so construing the language employed in the memorandum.
To accept defendant's contention would mean that plaintiff should not be compensated for the additional radiographic inspections, even though, admittedly, the value thereof (as well as their actual cost to plaintiff) was many times the agreed value of the omitted magnetic particle inspections. Such an interpretation is so unreasonable that even defendant now urges that the court find (in lieu of such an agreement) that the parties did not reach a meeting of the minds either "as to the method of payment or as to who would stand the expense of radiography contemplated by the change in the specifications." On this premise, defendant apparently believes it should receive, without charge, the benefit of plaintiff's labor and materials.
We believe there was a meeting of the minds whereby defendant impliedly obligated itself to pay for the reasonable value of additional radiographic work, subject to a credit for the value of the omitted magnetic particle inspections. Two facts relating to these 2,387 additional radiographs are beyond question, (1) they were performed at a specific instance and request of defendant, and (2) the original contract between the parties did not obligate plaintiff to perform such work. Defendant argues that the State "did not require" the modification agreed upon and therefore defendant received no "benefit" from the performance of the additional radiographic work. This is a nonsequitur. We note from the memorandum above quoted that it was defendant itself which suggested to the State that all butt splices and all girders be 100 per cent radiographically inspected. This was undoubtedly for the interest of defendant. The inference is clear that the additional radiographic inspections were beneficial to the defendant. Certainly plaintiff had the right to act on that assumption. Whether or not the change was required by the State or would have been required had not defendant agreed thereto (as plaintiff argues) is immaterial so far as plaintiff is concerned, since the change was actually made and the additional work was performed by plaintiff at defendant's specific request.
That the services performed by plaintiff were valuable is not questioned, nor is the fact that they were properly performed. Under the evidence, it is clear that plaintiff expected payment for the services and that defendant either was or should have been aware that the services were being performed with such expectation. The law implies an agreement to pay the reasonable value of the services. Tomasso v. Sorbets, Mo. App., 147 S.W.2d 151, 152.
Defendant suggests, as a further basis of its asserted non-liability for the 2,387 additional radiographs, that the following provision, constituting part of the printed "terms and conditions" on the back of the Purchase Order, precludes recovery:
"(6) No revisions of the work are to be made or extra work performed by the Sub-contractor without the Contractor's written approval thereof and of the costs involved therein."
We do not agree.
The only "revision" of the work was the deletion of the unperformed portion of the magnetic particle inspection, and such revision is not questioned by defendant. So, too, the "costs involved" in such "revision" is simply the sum of $1,430.00, and that amount also is not in dispute.
As for the 2,387 additional radiographs, we do not believe they are "extra work performed" within the meaning of the Purchase Order or the contemplation of the parties. This work was, of course, additional to that with respect to which the parties originally contracted. As we view the evidence, there was a new agreement, independent of the original contract, for the performance *56 of additional radiographs, all of which were ordered by defendant. That the price to be paid for this additional work was not agreed upon does not affect our conclusion. Defendant's contention is an obvious afterthought. In any event, to the extent this printed condition may be deemed applicable, we hold that under the evidence it has been waived by defendant. 17A C.J.S. Contracts § 371(5), pp. 409-410. Taking into consideration the manner in which the additional work was agreed upon and performed, as well as the actions of defendant in continuing to order and receive the benefit of the additional radiographs, and the course and conduct of the parties, the intention of the parties to waive, modify or rescind this printed provision, if applicable, is clearly to be inferred, and we so hold. Cf. Sitkin v. Smith, 35 Ariz. 226, 276 P. 521, 66 A.L.R. 645; Jobst v. Hayden Bros., 84 Neb. 735, 121 N.W. 957, 50 L.R.A.,N.S. 501; and J. T. Majors & Son, Inc. v. Lippert Bros., Inc., 10 Cir., 263 F.2d 650, 654.
We rule and hold therefore that defendant is liable to plaintiff for the reasonable value of all radiographic inspections performed by plaintiff additional to those required under the fixed fee contract.
There is a conflict in the evidence as to the reasonable value of such work. Plaintiff argues, based on its construction of the express contract, that defendant agreed to pay $5.40 for each radiograph, regardless of quantity or other considerations which might affect the price. Defendant urges, and the evidence supports such a finding, that the reasonable value of the work required in making the radiographs in addition to those required by the contract does not exceed $3.00 to $3.50 per shot. We also take note of the fact that the cost of the 2,644 radiographs which the original contract required would be $3.27 on plaintiff's theory that $8,646.00 of the contract price was referrable to the original required number of radiographs and the balance to the magnetic particle inspection.
We find from the credible evidence that under the circumstances of this case the reasonable value of the additional radiographs, and a reasonable charge therefor, should be $3.50 each. We have not overlooked the fact that in its Brief defendant appears to concede liability for the 954 retake shots at $5.40 each. However, this concession is premised on the theory that defendant is not liable at all for the remaining 2,387 additional radiographs, as well as on other considerations applicable thereto. In any event, defendant has made no conclusive judicial admission. On plaintiff's theory of the case, it is entitled to no more (and we should not award it any more) than the reasonable value of the radiographs additional to the number required under its fixed fee contract, and that number we have found to be 2,644. Having found such reasonable value to be only $3.50 per radiograph, we see no reason for awarding plaintiff any greater sum than their reasonable value for the 954 retakes.
We find, therefore, that for the 3,341 additional radiographs defendant is liable to plaintiff in the sum of $11,693.50, subject to an admitted credit of $1,430.00, the agreed value of the omitted magnetic particle inspections. Defendant has paid a total of $24,406.80 on account of the fixed fee contract, which leaves a balance of $914.88 on the original contract price. Adding this balance to the amount due for the additional radiographs, we find that defendant is liable to plaintiff in the aggregate sum of $11,178.38.
Request for payment was made in a letter dated August 19, 1964, presumably received the following day. Demand need not be made in any particular form, nor is it necessary that the word demand be employed. Any intimation that payment is desired is sufficient. Baker v. J. W. McMurry Contracting Co., 282 Mo. 685, 223 S.W. 45, 52. Plaintiff is entitled to interest at the rate of 6 per cent per annum from August 20, 1964, the date of demand, to the date of judgment.
*57 The foregoing memorandum constitutes our findings of fact and conclusions of law. The Clerk is directed to enter judgment in favor of plaintiff in the sum of $11,178.38 together with interest thereon computed at the rate of 6 per cent per annum from August 20, 1964 and costs.