Abe J. GUSTIN, Jr., Plaintiff/Counterclaim Defendant,

v.

The FEDERAL DEPOSIT INSURANCE CORPORATION as Receiver for The Merchants Bank, Defendant/Counterclaim Plaintiff

and

Boatmen's First National Bank of Kansas City, Defendant/Counterclaim Plaintiff.

No. 93–0054–CV–W–1.

United States District Court, W.D. Missouri, W.D.

Oct. 20, 1993.

James Borthwick, William Sanders, Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, MO, for plaintiff.

James F. Duncan, David L. Skidgel, Leonard Wagner, Daniel Fowler, Watson, Ess, Marshall & Enggas, Kansas City, MO, for Boatmen's.

Mark McGrory, Morrison and Hecker, Kansas City, MO, for F.D.I.C.

## ORDER

WHIPPLE, District Judge.

Before the Court is Boatmen's Bank's Motion for Summary Judgment on Abe Gustin's Second Amended Complaint and Count I of Boatmen's Counterclaim.[1] This lawsuit arises out of a series of promissory notes issued by Gustin to Merchants Bank which were subsequently transferred to Boatmen's. Gustin brought suit praying this Court to find the bulk of these notes void as a result of misconduct by Merchants. Boatmen's contends that Gustin's claims are barred by a settlement signed by Gustin and by the *D'Oench, Duhme* doctrine, codified at 12 U.S.C. § 1823(e). After due consideration of the record, the Court finds both of Boatmen's arguments persuasive and thus, grants said motion.

### I. Standard for Summary Judgment

A movant is entitled to summary judgment pursuant to Federal Rule of Civil Procedure 56(c), "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving

---

1. Said Motion, together with Suggestions in Support was filed by Bridge Bank on April 15, 1993. On July 6, 1993, the Court substituted Boatmen's in place of Bridge Bank because Boatmen's had acquired the assets at issue in this case. Gustin filed Suggestions in Opposition on July 12, 1993. Boatmen's filed Reply Suggestions on August 12, 1993.

party bears the burden of proof. *Aetna Life Insurance Co. v. Great National Corp.*, 818 F.2d 19, 20 (8th Cir.1987).

After the moving party discharges this burden, the non-moving party must do more than show that there is some doubt as to the facts. *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). Instead, the nonmoving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

When considering a motion for summary judgment, the court must scrutinize the evidence in the light most favorable to the non-moving party, according the non-moving party the benefit of every factual inference. *Buller v. Buechler*, 706 F.2d 844, 846 (8th Cir.1983). In addition, the court is required to resolve all doubts as to the facts or existence of any material fact against the moving party. *Robert Johnson Grain Co. v. Chem. Interchange Co.*, 541 F.2d 207, 210 (8th Cir. 1976). With these principles in mind, the Court turns to an examination of the facts.[2]

## II. Facts

Based on Gustin's employment history, it is clear that he is a veteran businessman with a great deal of experience in financial matters. From 1977 to 1980, Gustin was president of ABA Distributorship, which sold beer wholesale in North Kansas City. From 1980 until approximately 1985, Gustin was president, and later chairman of the board of Juneau Holding Company, which owned eighteen Taco Bell restaurants. Gustin has been associated with Applebee's International, Inc. since 1983 and currently is its president, chief executive officer, and chairman of the board. At each of these companies, Gustin's responsibilities included oversight of financial matters and obtaining loans.

In September of 1991, Merchant's held several notes signed by Gustin on the face of which the total principal exceeded $9.3 million. Some of these notes were issued in connection with Gustin's purchase of CameraAmerica Franchising stock in 1985 and Applebee's stock in 1988. Other notes were signed, co-signed or guaranteed by Gustin as a result of strong arm tactics by Merchants which included threats to call past loans due and to refuse to make future loans.[3] Gustin alleges that these tactics constituted antitying violations pursuant to 12 U.S.C. § 1972.[4]

Gustin made some payments on these notes until September of 1989,[5] after which, none were forthcoming. In September of 1991, Gustin and his attorney met with John Houston, the president of Merchants, and Pete Roszel, an officer of Merchants, in Houston's office. In that meeting, Gustin told Houston that he was not responsible for and did not intend to pay much of the debt Merchants claimed Gustin owed. Houston responded that because Gustin had signed the notes, Gustin was responsible for their repayment. At this meeting, Merchants threatened to call the notes signed by Gustin unless Gustin would sign a settlement which consolidated the prior notes. Gustin initially refused to do such and left the meeting. That night, Gustin told Eugene Pereira, an advisor to Merchants and its former president, that he intended to file a lawsuit against Merchants the next day.[6] Pereira asked Gustin to wait.

---

**2.** For the purpose of this Order, the Court will assume as true the facts alleged by Plaintiff, as well as those alleged by Defendant to which Plaintiff did not object.

**3.** These transactions and their dates were as follows:

| (1) | Boutross Guarantee | 1985–86 |
| (2) | Kodak Loan Transactions | 1987–1988 |
| (3) | GAR/Spread Eagle Guarantees | March 1988 |
| (4) | CameraAmerica Litigation | August 1989 |
| (5) | Kodak Litigation | December 1990 |

**4.** This statute prohibits a bank from extending credit on the condition or requirement that the customer obtain some additional credit or property from the bank or that the customer provide some additional credit, property or service to the bank.

**5.** The record does not indicate whether Gustin's payments were current as of that date.

**6.** Gustin believed he had claims against Merchants as early as March of 1988.

Over the next three months, Merchants continued to employ economic coercion as a tactic to force Gustin to sign the settlement. During this time, Gustin (represented by an attorney) and Houston negotiated various aspects of the settlement, with both parties drafting a number of versions of such. As a result of these negotiations, a Settlement Agreement, Restated Promissory Note, and Restated Stock Pledge Agreement were executed by Merchants and Gustin on December 23, 1991. Said documents reduced the amount of Gustin's indebtedness from $9,459,289.39 to $9.1 million, and set a rate of interest of eight percent (8%) per annum on the unpaid principal. This amount was to be paid largely from the sale of pledged Applebee's stock. In addition, the settlement extended the time provided for repayment of the indebtedness and provided for a mutual release which stated in part:

> (d) *Waiver.* Gustin hereby waives, discharges and releases forever any and all existing claims, defenses and rights of set-off that he may have against the Bank or which might affect the enforceability by the Bank of its rights and remedies under any of the Loan Documents.

According to the Settlement Agreement, Gustin was to make quarterly principal payments by May 30, 1992 and by late September of 1992, or else surrender shares of the pledged stock. Gustin did not make either of these payments, nor did he notify Merchants of a surrender of shares. In addition, an annual payment of principal was due under the Settlement Agreement in December of 1992, but again was not forthcoming. In fact, Gustin never made a single payment called for under the Settlement Agreement and stated at his deposition that he never had any intention of making such payments unless ordered to do so by the courts.

On November 20, 1992, Merchants was declared insolvent and the Federal Deposit Insurance Corporation ("FDIC") was appointed its liquidating agent by the Circuit Court of Jackson County pursuant to Mo. Rev.Stat. § 361.365. FDIC and Bridge Bank, a national banking association chartered as a bridge bank in accordance with 12 U.S.C. § 1821(n), entered into an agreement whereby Bridge Bank acquired certain assets, including the Settlement Agreement, Restated Promissory Note, and Restated Stock Pledge Agreement. On March 1, 1993, the Court entered an order prohibiting Defendants from selling, transferring or disposing of any of said stock. Boatmen's purchased the note and accompanying documents for $5.7 million on April 23, 1993. This amount represented the note's "book value" as carried on Merchants' books and was determined in accordance with the market value of the pledged stock at that time.

On July 14, 1993, Gustin filed his Second Amended Complaint against FDIC and Boatmen's seeking monetary damages, declaratory relief, an accounting and an injunction prohibiting Boatmen's from selling Gustin's pledged stock. It alleges the following: (1) Merchants violated the anti-tying statute by exploiting its economic power over Gustin requiring him to become further indebted to Merchants; (2) Merchants procured Gustin's agreement to the aforementioned transactions by duress and coercion, making the Settlement Agreement, Restated Promissory Note, and other agreements and notes completely void; and (3) Merchants breached its common law duty to Gustin of good faith and fair dealing in the performance of its contracts with Gustin.

On July 29, 1993, Boatmen's responded by filing a Counterclaim against Gustin seeking $9.1 million together with interest[7] and attorney's fees.[8] As of August 16, 1993, Boatmen's claim exceeded $10.5 million, including principal of $9.1 million, accrued interest in the amount of $1,347,305.56, and attorneys'

---

7. The Restated Promissory Note required Gustin to pay the principle sum of $9.1 million on November 6, 1993, "together with interest on the unpaid principle balance hereof at a rate of interest equal to eight percent (8%) per annum." It further provides that any amount not paid when due "shall bear interest from the date when due until paid" at ten percent (10%) per annum.

8. The Restated Promissory Note states:

> The Maker agrees to pay all reasonable costs of collection, including attorneys' fees, paid or incurred by the Holder in enforcing this Promissory Note on default or the rights and remedies herein provided.

fees in excess of $100,000. Boatmen's holds 1,616,666 shares of Gustin's stock in Applebee's as collateral for the contested indebtedness. As of August 9, 1993, the value of said stock was approximately $34 million.

### III. Discussion

#### A. Pre–Settlement Misconduct Waived by Settlement

■ Settlement agreements are favored by the courts. *Caleshu v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 737 F.Supp. 1070, 1086 (E.D.Mo.1990), *aff'd without opinion*, 985 F.2d 564 (8th Cir.1991), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 1963, 118 L.Ed.2d 564 (1992). Voluntary settlement of a dispute accompanied by a release avoids the expense of litigation, promotes certainty for the parties, and relieves a strained judicial system; therefore, settlement agreements should be encouraged. *Anselmo v. Manufacturer's Life Ins. Co.*, 595 F.Supp. 541, 551 (W.D.Mo.1984), *aff'd*, 771 F.2d 417 (8th Cir.1985).

■ Settlement agreements are contracts and as such, they are subject to general rules of contract construction. *N.L.R.B. v. Superior Forwarding, Inc.*, 762 F.2d 695, 697 (8th Cir.1985). Under Missouri law, whether a contract was in fact made, and its terms does not depend upon what one of the parties understood or intended, but rather upon what was actually said and done by the parties. *Bare v. Kansas City Fed'n of Musicians*, 755 S.W.2d 442, 444 (Mo.App.1988); *St. Louis Testing Lab., Inc. v. Mississippi Valley Structural Steel Co.*, 254 F.Supp. 47, 53 (E.D.Mo.1966), *aff'd*, 375 F.2d 565 (8th Cir.1967). Unless the agreement is ambiguous, the intention of the parties and interpretation of the contract are for the court to determine from the four corners of the document. *Press Machinery Corp. v. Smith R.P.M. Corp.* 727 F.2d 781, 784 (8th Cir. 1984). Moreover, whether a contract is ambiguous is itself a question of law to be determined by the court. *Id.*

■ Under these elementary rules of contract construction, the Settlement Agreement which Gustin executed in December of 1991 waived and released all claims Gustin may have had at that time to his obligations to Merchants. Thus, Gustin is barred from asserting those claims which arose out of Merchants' conduct prior to the execution of the Settlement Agreement. Gustin presents a variety of arguments to show that his claims of duress and anti-tying violations against Merchants survive said agreement. However, the Court does not find any of them convincing.

■ Plaintiff suggests that the language of release in the Settlement Agreement does not bar his claims because it does not specifically include them. A contract which is clear and unambiguous on its face is not open to judicial construction. *Speedie Food Mart, Inc. v. Taylor*, 809 S.W.2d 126, 129 (Mo.App. 1991). In determining whether a contract provision is ambiguous, the words are to be given the plain and ordinary meaning understood by the average reasonable person. *Central States v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1350 (8th Cir.1990), *cert. denied*, ⸺ U.S. ⸺, 112 S.Ct. 59, 116 L.Ed.2d 35 (1991). The release executed by the parties includes all claims, defenses or rights of setoff regarding the debt. Therefore, giving the words their plain meaning, it naturally includes the claims of duress and anti-tying violations by Merchants prior to the execution of the Settlement Agreement.

#### B. No Showing of Settlement Misconduct

■ Next, Gustin argues that the Settlement Agreement itself was the product of duress and is therefore void.[9] Whether particular facts are sufficient to constitute duress is a question of law for the court. *Schmalz v. Hardy Salt Co.*, 739 S.W.2d 765, 768 (Mo.App.1987); *Anselmo*, 771 F.2d at 419–20. The Court finds that the facts underlying Gustin's claim of duress in signing the Settlement Agreement do not amount to duress.

9. In Plaintiff's Suggestions in Opposition to Defendant's Motion for Summary Judgment, Gustin specifically states that Merchants did not commit any violations of the anti-tying statute in connection with the execution of the Settlement Agreement.

**508**

A person claiming duress must demonstrate that he/she was so oppressed from the wrongful conduct of another as to deprive him/her of free will. *Schmalz*, 739 S.W.2d at 768. The conduct cannot constitute duress unless it is wrongful. *Id.; Oliver v. RTC*, 747 F.Supp. 1351, 1356 (E.D.Mo. 1990), *aff'd*, 955 F.2d 583 (8th Cir.1992). It is not duress to do, or to threaten to do, what one has a right to do. As the *Oliver* court ruled, because "[a] threat to foreclose on delinquent loans [is not] wrongful, plaintiffs fail to state a claim for coercion." 747 F.Supp. at 1356. Because Gustin was in default and Merchants had the right to foreclose on Gustin's collateral, Merchants' threat to foreclose is in no way illegal or wrongful.

In addition, courts have recognized that where an experienced businessman takes sufficient time, seeks the advice of counsel and understands the content of what he is signing, he cannot claim the execution of the instrument was the product of duress. *Schmalz*, 739 S.W.2d at 768; *Anselmo*, 771 F.2d at 420. In the case at bar, the record is clear that Gustin is a sophisticated businessman with a great deal of experience in financial affairs. Furthermore, he was represented by an attorney throughout the settlement negotiations. It is plain that Gustin was fully aware of, and understood, the terms of the Settlement Agreement, and based upon such knowledge, determined that his economic situation was improved by signing it.

Gustin further argues that banks should not be able to avoid liability for wrongdoing by inserting "boilerplate" waiver and release clauses "in a concurrent or subsequent agreement while the economic coercion continues unabated." However, the record indicates that the Settlement Agreement was not a contract of adhesion, but rather the product of three months of negotiations between Gustin, his attorneys, and Merchants, whereby Gustin received a number of concessions from Merchants. First, the three month period itself followed a two year period in which Gustin was in default on a number of the notes. Thus, the Settlement Agreement allowed Gustin to avoid acceleration and foreclosure. Second, the Settlement Agreement consolidated the indebtedness, reduced it by $359,289.39 and extended the terms of repayment.

Similarly, Gustin contends that "allowing a waiver of anti-tying claims while the original coercion still exists," would defeat the policies which underlie the statute, namely to protect borrowers from "unfair and predatory practices by banks...." H.R.CONF.REP. No. 1747, 91st Cong., 2d Sess. 29 (1970), *reprinted in* 1970 U.S.C.C.A.N 5519, 5535. To support this contention, Gustin cites cases construing the Fair Labor Standards Act ("FLSA") which hold that an employee cannot waive the FLSA's protection. However, the issue in the instant case is not whether Gustin could waive his "protection" under the anti-tying statute prior to accrual of a cause of action for its violation,[10] but rather, whether a person can compromise and release his or her private cause of action after it has accrued. The Court finds that as a matter of public policy, a private cause of action under the anti-tying statute, like any other cause of action for damages, may be compromised and settled. *Weisert v. Bramman*, 358 Mo. 636, 216 S.W.2d 430, 434–35 (1948) ("Any dispute which can be the subject of an action or a suit may be the basis of a compromise, and its settlement will afford a consideration therefor.").[11]

10. Whether such a waiver would be valid is questionable. Under both the FLSA and the anti-tying statute, Congress was clearly attempting to protect the party to a contract who was vulnerable to the coercive economic power of the other. In both instances, this purpose would be defeated if courts recognized a waiver of the protection at the outset of the relationship.

11. Gustin is correct when he states that had Merchants held a gun to Gustin's head in order to make him sign the notes, guarantees and agreements at issue, the signed documents would clearly be void due to duress. However, Gustin's argument that the result is the same in this case because Merchants held a gun to Gustin's financial interests does not find support in the case law.

The only case Gustin cites as a basis for this analogy, *Aurora Bank v. Hamlin*, 609 S.W.2d 486 (Mo.App.1980), is inapposite. In that case, the lender made misrepresentations of law which were relied upon by the borrower. The facts of the case at bar indicate that Gustin was .fully aware at all times of all material facts. The

### C. The D'Oench, Duhme Doctrine

■■■■ An alternative grounds for the Court's holding is the *D'Oench, Duhme* doctrine which give the FDIC "superpowers" vis-a-vis parties with claims against failed financial institutions. The Court rules, for the reasons discussed below, that this doctrine insulates FDIC from Gustin's claims of: (1) duress against Merchants in connection with the execution of the Settlement Agreement and (2) duress and anti-tying violations by Merchants prior to the settlement. Because FDIC is insulated, Boatmen's, as a subsequent purchaser of the note, is also insulated. *FDIC v. Newhart*, 892 F.2d 47, 50 (8th Cir.1989).

In *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), the FDIC acquired a note in a purchase and assumption transaction. The maker asserted a defense of failure of consideration based on an undisclosed agreement between it and the failed bank that the note would not be called for payment. The Supreme Court held that this "secret agreement" could not be a defense to suit by the FDIC because it would tend to deceive the banking authorities. *Id.* at 460, 62 S.Ct. at 680. The Supreme Court stated that when the maker "lent himself to a scheme or arrangement whereby the banking authority ... was likely to be misled," the scheme or arrangement could not be the basis for a defense against the FDIC. *Id.*

Congress codified certain aspects of this doctrine in 12 U.S.C. § 1823(e) [12] which provides:

> No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the [FDIC] unless such agreement—
>
> (1) is in writing,
>
> (2) was executed by the depository institution and any person claiming an adverse

interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

> (3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and
>
> (4) has been, continuously, from the time of its execution, an official record of the depository institution.

It is clear that the statements and conduct by Merchants which allegedly placed Gustin under duress "tend to defeat or diminish the interest of the FDIC" in the Restated Promissory Note. It is equally clear that the four express requirements of the statute were not met. Thus, the issue becomes whether said statements and conduct constitute an "agreement" within the meaning of § 1823(e). The Court is guided by *Langley v. FDIC*, 484 U.S. 86, 90, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987), in which the Supreme Court held that the alleged fraud of a failed bank did in fact constitute an "agreement," and was thus, no defense to FDIC's enforcement of the note.

The Supreme Court explained that a contrary construction of the statute would frustrate its purpose to allow bank examiners to rely on a bank's records and to permit the FDIC to determine whether to liquidate a failed bank or to provide financing for purchase of its assets by another bank. *Id.* at 91, 108 S.Ct. at 401. This determination must be made with great speed in order to preserve the going concern value of the failed bank and avoid an interruption in banking services. *Id.* The Supreme Court concluded:

> Neither the FDIC nor state banking authorities would be able to make reliable evaluations if bank records contained seemingly unqualified notes that are in fact subject to undisclosed conditions.

*Id.,* at 91–92, 108 S.Ct. at 401–402.

■■■ The *Langley* Court also discussed the distinction between void and voidable

---

*Aurora Bank* court ruled, Missouri law does not recognize a claim for duress "where there is knowledge of the facts and opportunity for investigation, deliberation and reflection." *Id.,* at 489.

**12.** In *Firstsouth, F.A. v. Aqua Constr., Inc.,* 858 F.2d 441, 442, n. 2 (8th Cir.1988), the Eighth Circuit ruled that § 1823(e) "essentially codifies the *D'Oench, Duhme* doctrine."

title in connection with § 1823(e). The Supreme Court noted that a real defense, such as fraud in the factum, in which a party's signature is procured without knowledge of the true nature of the instrument or its contents, renders an instrument entirely void, leaving no interest to be diminished or defeated within the meaning of the statute. *Id.*, at 93–94, 108 S.Ct. at 402. Because there is no interest in a void instrument to be transferred, the Court reasoned, real defenses are not precluded by § 1823(e). *Id.* In contrast, however, personal defenses such as fraud in the inducement render a note voidable, not void. *Id.*, at 94, 108 S.Ct. at 402. A bank holding a voidable note can transfer to the FDIC voidable title, which is enough to constitute an "interest" in the note within the meaning of § 1823(e). *Id.*

Thus, the issue in the present case is whether the duress and anti-tying violations alleged by Gustin constitute real or personal defenses. Unfortunately, there are no cases in the Eighth Circuit which provide a clear answer to this question. However, the overwhelming number of courts from outside the Eighth Circuit which have faced this issue have found these claims to be personal defenses.[13] The Court finds these cases persuasive.[14]

In *Newton v. Uniwest Fin. Corp.*, 967 F.2d 340 (9th Cir.1992), FDIC sought to enforce certain notes executed by the borrower of a failed bank. The borrower asserted the defenses of duress and anti-tying violations under 12 U.S.C. § 1464(q). Concerning the latter, the borrower argued that the *D'Oench, Duhme* doctrine should not apply to a claim based on a separate and independent federal statutory violation, rather than on just a secret agreement. Concerning the

former claim, the borrower contended that there was no secret agreement on which to base application of the doctrine because the agreement was made under duress. However, the Ninth Circuit ruled that both claims were barred by the *D'Oench, Duhme* doctrine citing its concern that "the government's financial institutions be able to perform their services efficiently, particularly during the current savings and loan crisis." *Id.*, at 346–47.

In *Diamond v. Union Bank and Trust of Bartlesville*, 776 F.Supp. 542 (N.D.Okl.1991), FDIC sought to enforce certain notes against some customers of a failed bank who alleged as defenses economic duress and anti-tying violations by the failed bank. The customers contended that the bank would not renew their line of credit unless they assumed liability on an unrelated note. The court looked to local law to determine that economic duress only renders an instrument voidable, and thus, is "sufficient to trigger FDIC's rights under § 1823(e)." *Id.*, at 543. Concerning the anti-tying violations, the court ruled that it constituted an "unwritten agreement," and thus, was unenforceable under § 1823(e). *Id.*

In *NCNB Texas Nat'l Bank v. King*, 964 F.2d 1468 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2305, 119 L.Ed.2d 226 (1992), a subsequent purchaser of a note attempted to enforce it against its maker who asserted a defense based on anti-tying violations by the original purchaser. The Fifth Circuit held that the *D'Oench, Duhme* doctrine barred the defense, ruling that a private claim under the Bank Tying Act is based on an unrecorded agreement, and accordingly, cannot be asserted against the FDIC or its subsequent transferees. *Id.*, at

---

**13.** The Court was able to locate two cases with somewhat contrary holdings: *Commerce Fed. Sav. Bank*, 872 F.2d 1240 (6th Cir.1989); *Desmond v. FDIC*, 798 F.Supp. 829 (D.Mass.1992).

**14.** When determining whether duress is a personal or real defense, most courts expressly look to local law. In *Anselmo*, 771 F.2d at 417, the Eighth Circuit interpreted Missouri state law to determine whether duress voids a contract. In this case, a former employee sued for breach of contract, prima facie tort, and fraudulent misrepresentation following termination of his employ-

ment. The employer argued that a release signed by the employee barred these claims, to which the employee contended he signed under economic duress. The employee claimed that the employer stated that if the release was not signed, the employee would not receive severance pay and would be denied references for future employment. The Eighth Circuit, affirming an opinion written by Judge Bartlett of the Western District, cited Missouri case law for the proposition that "contracts induced by duress are voidable, not void." *Id.* at 420.

1470. *Accord FDIC v. Gettysburg Corp.*, 760 F.Supp. 115 (S.D.Tex.1990), *aff'd*, 952 F.2d 400, (5th Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 70, 121 L.Ed.2d 36 (1992). The Fifth Circuit supported its position by pointing to the doctrine's underlying policy of "protecting the FDIC and its assignees," as articulated in *Kilpatrick v. Riddle*, 907 F.2d 1523 (5th Cir.1990), *cert. denied, Rogers v. FDIC*, 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991).

In *FDIC v. Meyer*, 755 F.Supp. 10 (D.D.C. 1991), FDIC sued to collect on a note signed by former partners of a law firm which secured loans by a bank to enable the partners to purchase stock in another bank. The partners asserted economic duress contending that it was a real defense and thus survived the *D'Oench, Duhme* doctrine. The *Meyer* court looked to local law and the Second Restatement of Contracts, Introductory Note, Ch. 7, Topic 2, ruling that "physical compulsion is the only type of distress that can render a transaction entirely void." *Id.*, at 13.

In *FDIC v. Rusconi*, 808 F.Supp. 30 (D.Me.1992), FDIC brought action against borrowers and guarantors seeking foreclosure of a mortgage. The defendants argued that they had been pressured into signing the relevant documents by the failed bank's threats of economic harm. The court found that there was no evidence that the defendants were "bereft of the quality of mind essential to the making of a contract." *Id.*, at 41. Thus, the court concluded that defendants had failed as a matter of law to establish the existence of a factual question on this issue of duress. *Id.*

Thus, in accordance with the vast majority of decisions on point, the Court rules that Gustin's claims of duress and anti-tying violations against Merchants constitute personal defenses, and as such, do not survive the *D'Oench, Duhme* doctrine.

### IV. Conclusion

If the facts alleged by Gustin are true, the Court is disgusted by Merchants' conduct in its financial dealings with Gustin. Merchants' extension of credit contingent upon Gustin's acceptance of unrelated indebtedness, along with its numerous threats of economic ruin, likely constituted a violation of the federal anti-tying statute. It should also be noted, however, that Gustin benefitted greatly from other illegal conduct of Merchants, namely Merchants' loan to Gustin and associates for one hundred percent of the purchase price of the Applebee's company in direct violation of banking regulations.

Nonetheless, the Court finds that: (1) any pre-settlement misconduct was waived by the settlement; (2) the facts underlying Gustin's claim of duress in signing the Settlement Agreement, as a matter of Missouri state law, do not amount to duress; and (3) the *D'Oench, Duhme* doctrine bars Gustin's claim of duress against Merchants in connection with the execution of the Settlement Agreement, and Gustin's claim of duress and anti-tying violations by Merchants prior to the settlement.

Accordingly, it is ORDERED that Defendant Boatmen's Motion for Summary Judgment on Plaintiff Gustin's claims for relief is GRANTED.

It is further ORDERED that Defendant Boatmen's Motion for Summary Judgment on its counterclaim for enforcement of the terms of the $9.1 million Restated Promissory Note is GRANTED.

It is further ORDERED that Plaintiff Gustin pay Defendant Boatmen's $9.1 million together with interest on the outstanding principal at the rate of eight percent (8%) per annum from December 11, 1991 until the debt is completely paid.[15]

It is further ORDERED that the Preliminary Injunction issued by the Court on March 1, 1993, prohibiting Defendants from selling, transferring or disposing of any of Plaintiff Gustin's pledged Applebee's stock is VACATED.

---

**15.** The Court declines to award interest in the amount of ten percent (10%) per annum on amounts not paid when due, as stated in the Restated Promissory Note. In that Boatmen's purchased said note at such a significant discount, the Court rules that an award of interest at such a rate would shock the Court's conscience.

512

It is further ORDERED that Boatmen's may sell, transfer or dispose of only so much of Plaintiff Gustin's pledged Applebee's stock as is necessary to recover the outstanding debt consisting of principal plus accrued interest. Such sale, transfer or disposition must be affected pursuant to reasonably prudent commercial practice, after which, the remaining shares of said stock must be immediately returned to Gustin.

It is further ORDERED that Defendant Boatmen's submit a brief by November 10, 1993 on the issue of its claims for attorneys fees and court costs. Said brief must be accompanied by the contemporaneous time sheets of the defense attorneys involved in this case. Plaintiff Gustin may file a Reply Brief by November 20, 1993.