VANGUARD PACKAGING, INC., Plaintiff,

v.

**MIDLAND BANK, et al., Defendants.**

No. 93–0721–CV–W–3.

United States District Court, W.D. Missouri, Western Division.

Dec. 29, 1994.

Gardiner B. Davis, Spencer, Fane, Britt & Browne, Kansas City, MO, for plaintiff.

Brian D. Williams, Watson & Marshall, L.C., Kansas City, MO, Robert L. Hawkins, III, Hawkins Law Offices, Jefferson City, MO, John W. McClelland, John Bradley Pace, King, Burke, Hershey, Farchmin & Schlomann, Kansas City, MO, Jon E. Beetem, Nickolaus, Green & Beetem, Jefferson City, MO, Albert A. Riederer, Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, for Midland Bank.

James R. Wyrsch, Michael P. Joyce, Ronald Dean Lee, Wyrsch, Atwell, Mirakian, Lee & Hobbs, P.C., Kansas City, MO, for Lee H. Greif.

Dennis L. Davis, Hillix, Brewer, Hoffhaus, Whittaker & Wright, L.L.C., Brian D. Williams, Kansas City, MO, for Steven R. Taylor.

### MEMORANDUM OPINION AND ORDER

ELMO B. HUNTER, Senior District Judge.

Plaintiff's claim in this matter is one of economic duress. Its contention is that Defendant, acting through his agent(s),[1] essentially forced it to buy, for $1,000,000.00, 2,000 shares of Midland Bancor stock that it didn't

---

1. It is conceded that the persons at Midland, with whom Plaintiff dealt, were agents of Defendant.

want. Due to Defendant's allegedly coercive actions, Plaintiff now requests this Court to declare this transaction voidable and set it aside.

## I. *JURISDICTION & VENUE*

Plaintiff is a Missouri corporation with its principal place of business located in Kansas City, Missouri. Defendant is a resident of the State of Kansas. Furthermore, the amount in controversy is in excess of $50,-000.00, exclusive of interest and costs. Therefore, this Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332(a)(1) (diversity of citizenship).

Personal jurisdiction over Defendant is present in this matter because all of the events relevant to this lawsuit took place in the State of Missouri. And finally, venue in this district is proper because a "substantial part of the events . . . giving rise to the claim occurred" in this district. 28 U.S.C. § 1391(a)(2).

## II. *FINDINGS OF FACT*

In 1975, Vanguard Packaging, Inc., ("Vanguard") was formed. It was, at that time, a business dedicated to selling polyethylene. Bobbie Mathes held 100% of the outstanding stock in the company. Four years later, however, Mr. Jack Mathes became vice president of Vanguard and acquired a 50% interest in the company with his wife, Bobbie, retaining the remaining 50%. Following Mr. Mathes's association with Vanguard, the company expanded its business to include the manufacture of corrugated boxes.

Fourteen years after the company was formed, in September, 1989, Vanguard, acting through its vice president Jack Mathes, borrowed $350,000.00 from Midland Bank[2] to be used primarily as operating capital and secondarily to pay off an existing loan with another bank. As a part of the loan agreement, Vanguard agreed, so long as it was indebted to Midland, that it would not borrow funds from any other source without first obtaining Midland's written consent. The agreement also required, *inter alia*, that Vanguard provide Midland with "monthly financial statements."[3] Consequently, Vanguard, through Mr. Mathes, continued to have contact and dealings with Midland at least once a month.

For more than a year this relationship continued very uneventfully. However, in or around the beginning of 1991, Defendant approached Mr. Ron L. Blunt[4] and asked him to seek out buyers for Defendant's Midland Bancor stock.[5] Mr. Blunt conveyed this message to Mr. Taylor and the ensuing events resulted in the filing of this lawsuit.

In or around the beginning of February, 1991, Mr. Taylor, in one of his monthly meetings with Mr. Mathes, mentioned the available Midland Bancor stock and inquired about Plaintiff's interest in purchasing such. Mr. Mathes conveyed that Vanguard had "no money" and, therefore, was not interested. At that time Mr. Taylor dropped the matter.

Approximately two months later, in late March, 1991, believing it needed additional operating capital to stay afloat, Vanguard approached Midland and requested an extension of $250,000.00 to its existing line of credit. In response to this request Plaintiff was told only that Mr. Mathes needed to update his personal financial statement. It took Mr. Mathes approximately two weeks, until early April, to provide Midland with the updated information it had requested.

Approximately one week later, Mr. Mathes called Mr. Taylor to inquire about the status of Vanguard's loan request. Taylor told Mathes that he had not yet begun to work on it and again asked about Vanguard's interest

---

**2.** This was actually in the form of a line of credit which could basically be borrowed against as needed.

**3.** These monthly reports were given to Steven R. Taylor, the vice president of Midland and loan officer for Vanguard.

**4.** Ron L. Blunt was the president of Midland Bank.

**5.** Defendant, at all relevant times, was the chairman of the board and a member of the loan committee at Midland Bank. He also owned a significant portion of the outstanding stock in Midland Bancor (of which Midland Bank was a subsidiary).

in purchasing Midland Bancor stock. At this time, or shortly thereafter, Mr. Mathes was told that the amount of stock available was $1,000,000.00 and that Midland could loan Vanguard the money to make the stock purchase. In sum, Mr. Taylor's proposition was to incorporate the existing $350,000.00 line of credit, the requested extension of $250,-000.00, and the loan of $1,000,000.00 (for the stock purchase) into one loan for $1,600,-000.00. This proposition was made in or around the end of April.

Although Mr. Mathes had earlier expressed Vanguard's disinterest in the stock, at this time, or very shortly thereafter, Mr. Mathes asked Mr. Taylor for financial information regarding the Midland stock. He did this not because Vanguard was particularly interested in purchasing the stock, but because he thought an expressed potential interest, valid or not, would keep the ball rolling on Vanguard's loan.

In the next few weeks, before the loan was ultimately approved, Mr. Mathes called Mr. Taylor several times requesting information on the loan's status. Each time he called he was told that they had not gotten to it yet. Additionally, each time Mr. Mathes called, Mr. Taylor would ask if Vanguard had made a decision about the stock purchase. Ultimately, after several weeks of this high-stakes cat and mouse game, Vanguard decided to purchase the stock under the terms Mr. Taylor had suggested. It did this because it needed the money for the business *and* because Mr. Taylor "had indicated that it was such a good investment to get into." (Tr. Vol. 1, p. 19 (Mathes)).

On May 20, 1991, Mr. Mathes informed Mr. Taylor of Vanguard's decision. The following day the transaction was completed. A promissory note was executed obligating Vanguard to pay Midland $1,600,000.00. In exchange for the note, Plaintiff received $1,250,000.00,[6] $1,000,000.00 of which was simultaneously transferred, via a check from Plaintiff to Defendant, for the stock purchase.[7] The monthly payments on this note amounted to approximately $19,000.00 per month. Plaintiff, as of the date of the trial of this matter, had not missed one payment.

In May, 1992, Plaintiff attempted to borrow an additional $200,000.00 from Midland. The Midland Bancor stock was pledged as collateral for this loan. Mr. Taylor told Mr. Mathes that Midland could not use, as collateral for a loan, stock in its own holding company. However, Midland did provide Vanguard with permission to go elsewhere and obtain the additional monies. Subsequently, using the stock as collateral, Vanguard received the requested $200,000.00 from Commercial Bank. This was a six-month loan that was repaid within that period of time.

Approximately one year later, mid–1993, Vanguard approached Commercial Bank and again requested and received a loan. This "loan" amounted to a $350,000.00 line of credit. Four months after this extension of credit was granted, Commercial Bank, following an examination of the stock/collateral, and a subsequent determination that at that time it did not provide adequate security for the outstanding line of credit Plaintiff had been granted, "called" the note due.

Although Plaintiff received a loan from Commercial Bank in mid–1993, using the stock as collateral, Mr. Mathes had by that time begun to suspect that the stock's value might be plummeting. In fact, in March, 1993, Plaintiff, for the first time, registered a complaint about the May 21, 1991, transaction. The complaint came in the form of a letter from Plaintiff's attorney which alleged that it had been the victim of an illegal tying action. Nonetheless, despite Mr. Mathes's early 1993 suspicions about the stock's value, through June, 1993, Vanguard continued to show a $1,000,000.00 asset (the Midland Bancor stock) on the financial statements provided to the banks. Shortly thereafter, Plaintiff removed the $1,000,000.00 stock asset from its financial statements.

On July 28, 1993, this lawsuit was filed against Midland Bank, Steve Taylor, Ron Blunt, and Lee Greif. The Complaint set forth a number of different grounds for re-

---

6. Plaintiff already owed $350,000.00.

7. Plaintiff received the stock certificates through the mail at a later date.

lief. Subsequently, on June 28, 1994, Plaintiff filed its Third Amended Complaint. For reasons now irrelevant, all of the original defendants except Mr. Lee Greif had been dismissed from the lawsuit. Plaintiff's original Complaint contained three (3) different claims against Mr. Greif. Again, for reasons now irrelevant, two of those three counts were subsequently dismissed. Therefore, by the time this case came to trial, the only remaining defendant was Mr. Greif, and the only remaining claim was one of economic duress.

### III. *CONCLUSIONS OF LAW*

As a general rule in this country, "the payment of money or the making of a contract may be under such circumstances of business necessity or compulsion as will render the same involuntary and entitle the party so coerced to recover the money paid, or excuse him from performing the contract."

*Steinger v. Smith*, 358 Mo. 39, 213 S.W.2d 396, 400 (1948). The question with which this statement obviously leaves us is under *what* "circumstances of business necessity or compulsion" may one recover monies paid? The answer to this question has been provided by subsequent case law establishing the parameters of what constitutes economic duress in Missouri.

In 1993, the Missouri Supreme Court, in *Andes v. Albano*, stated that "[t]he central question with respect to duress is whether, considering all the surrounding circumstances, one party to the transaction was 'prevented from exercising his free will by the threats or wrongful conduct of the other.'" 853 S.W.2d 936, 942 (Mo.1993) (quoting *McCandlish v. Linker*, 231 S.W.2d 162, 164 (Mo.1950)). When attempting to determine whether a plaintiff was bereft of its free will, the "surrounding circumstances" a court should consider include "'the age, sex, capacity, situation, and relation of the parties....'" *Aurora Bank v. Hamlin*, 609 S.W.2d 486, 488 (Mo.Ct.App.1980) (quoting *Ensign v. Home for the Jewish Aged*, 274 S.W.2d 502, 506 (Mo.Ct.App.1955)). Furthermore, "[a] claim of duress cannot generally be sustained where there is knowledge of the facts and opportunity for investigation, deliberation and reflection." *Id.* (citing *Weisert v. Bramman*, 358 Mo. 636, 216 S.W.2d 430, 434 (1948)). However, if despite the opportunity to reflect, the party claiming economic duress was left with no alternative other than the one forced upon it, the general rule obviously does not apply.

Furthermore, in order to establish a claim of economic duress, Plaintiff must show that the wrongful act, which overcame his free will, caused him to do something he would not have otherwise done. *Manufacturers Am. Bank v. Stamatis*, 719 S.W.2d 64, 66–67 at n. 2 (Mo.Ct.App.1986). And finally, because the "[f]inancial necessity of a party, not caused by the other party to a contract, does not constitute duress[,]" Plaintiff must show that its alleged economic exigency was *caused* by the wrongful act of Defendant. *Schmalz v. Hardy Salt Co.*, 739 S.W.2d 765, 768 (Mo.Ct.App.1987) (citing *Grant Renne & Sons, Inc. v. J.E. Dunn Constr. Co.*, 633 S.W.2d 166 (Mo.Ct.App.1982)).

In sum, to establish its claim of economic duress, Plaintiff must prove to this Court, by a preponderance of the evidence, that Defendant created a situation of economic exigency for Plaintiff by performing a wrongful act which, in light of all relevant circumstances, overcame Plaintiff's free will and forced it to do something it would not have otherwise done.

### IV. *DISCUSSION*

In the case at hand, Plaintiff claims that due to Defendant's wrongful conduct, it was bereft of its free will and forced to buy Midland Bancor stock it did not want. Specifically, Plaintiff contends that Defendant wrongfully "tied" the requested credit extension with the sale of his own stock. Furthermore, Plaintiff asserts that due to (1) its desperate financial situation at that time, (2) the provision in the existing Midland Bank agreement precluding Plaintiff from obtaining funds elsewhere, and (3) Midland's silent refusal to act on the loan request until Plaintiff agreed to buy the stock from Defendant, Plaintiff was deprived of its free will and

forced to enter into this unwanted transaction in order stay afloat.

### A. Wrongful Act

■ Taking Plaintiff's allegations as fact, and assuming, therefore, that a wrongful tying agreement was forced upon Plaintiff by Defendant, the question then becomes did that wrongful act cause the financial emergency Plaintiff claims to have been experiencing at the time, thereby placing Plaintiff in a position in which it had no alternative but to purchase the unwanted stock? The answer is clearly no. In fact, Plaintiff doesn't even claim that the wrongful act created the exigency. Rather, Plaintiff contends that although there was a pre-existing exigency, Defendant's actions (or more specifically inactions) would have prevented Plaintiff from meeting its business obligations but for its compliance with Defendant's unwanted proposal.

Plaintiff claims that the "doctrine of business compulsion applies specifically to cases in which a payment has been coerced from a party fearful that a refusal of the transaction would force him to breach other business obligations." In support of this position, Plaintiff cites the Court to the 1912 case of *Brown v. Worthington,* 162 Mo.App. 508, 142 S.W. 1082 (1912). In that case, the plaintiff had entered into an option contract with the defendant for the purchase of some hogs. The contract specifically provided the price to be paid as well as the amount of time the option lasted. Subsequently, plaintiff found a third-party buyer for some of the hogs he had the option to purchase. Plaintiff then went to defendant and attempted to purchase the hogs under the terms of the option contract. By this time, however, defendant had learned of the terms of the third-party contract, and although there was still time remaining on the original option contract, defendant refused to sell the hogs at the agreed upon price. Instead, he demanded a higher price before he would allow delivery. Plaintiff, being obligated on his contract with the third-party, agreed to the new terms because he felt he had no other alternative. In the subsequent lawsuit, the Court determined that when the "party paying has not had his freedom of exercising his will and paid the money under moral duress, in which event, if it is against equity and good conscience for the money to be withheld from plaintiff, it may be recovered." *Id.,* 162 Mo.App. 508, 142 S.W. at 1084–85.

Plaintiff in the present case claims that "[p]recisely such a situation is present on the facts before this Court." This Court does not agree. In fact, it cannot think of a better example of a case which illustrates the need for the element of causation in proving a claim for duress. Although there are some similarities between the two cases, there is at least one very significant difference.

In *Brown,* the Defendant was *obligated* to sell the hogs for a specified price to Plaintiff. However, by his willful failure to comply with his legal obligation, he purposefully placed Plaintiff in an economic predicament which forced him to do something he would not have otherwise done. In the present case, Defendant's inaction did not create the exigency. In fact, it is undisputed that the exigency was in existence *prior to* the alleged wrongful act of Defendant.

The 1912 *Brown* decision is in accord with the statement of the *Schmalz* Court some seventy-five years later: the "financial necessity of a party, not *caused* by the other party to a contract, does not constitute duress." 739 S.W.2d at 768 (emphasis added). In *Brown* the "financial necessity" was clearly *caused* by the other party to the contract. In the present case, however, the "financial necessity" was clearly *not caused* by the other party to the contract. Consequently, because the allegedly wrongful act did not cause the financial emergency, it is unnecessary for this Court to determine whether the act itself was wrongful.

### B. Loss of Free Will

■ The second major hurdle Plaintiff must clear in order to sustain his claim for recision of the contract due to economic duress is to show he was bereft of his free will and forced to do something he would not have otherwise done. Although the Court is convinced that Plaintiff was not actively pursuing this stock purchase, and indeed would have preferred to have gotten its loan with-

out purchasing the stock, Plaintiff has not shown by a preponderance of the evidence that it was deprived of its free will and forced to purchase the stock.

As mentioned above, this is a factual question which must be determined by looking to all of the surrounding circumstances. As the factual findings of this Court are fully set forth above, only a summary of the facts relevant to this particular aspect of this claim are set forth as follows:

(1) Mr. Mathes is a middle-aged, sophisticated businessman who had owned and operated businesses for at least sixteen years at the time of the stock purchase;

(2) Prior to this purchase Mr. Mathes had purchased stock in other banks and, therefore, was somewhat familiar with the process and the industry;

(3) Although Plaintiff contends in its pleadings that Midland dragged its feet on Plaintiff's loan request for more than two months, the facts adduced at trial indicate that Mr. Mathes's personal financials were not updated until some time in early April. It was then a week or so later that Mr. Mathes *first* called to see what the status of Vanguard's loan request was. It was at or around this time that Mr. Taylor first suggested the consolidation of the loans. Vanguard never said no to this proposition. Conversely, at this time (early April) Mr. Mathes asked for financial information on the stock. Vanguard never told anyone at Midland yes or no until May 20, 1991 (when it said yes). Therefore, in the interim, Midland was not sure whether Plaintiff was going to purchase the stock or not;

(4) No one at Midland ever told Plaintiff it had to buy the stock to get its requested loan extension;

(5) Although Plaintiff claims its request would have been denied, it never attempted to get permission to go elsewhere to get the allegedly needed funds;

(6) Plaintiff never attempted to get a loan from another bank to provide the needed capital as well as pay off the Midland loan despite the fact that Plaintiff claimed to have had a very good relationship with other bankers at Commercial Bank. Evidence presented at trial indicated that this would have been acceptable to Midland;

(7) In response to a question by Plaintiff's lawyer at the trial of this matter, Mr. Mathes stated that Mr. Taylor had expressed that the stock was possibly going "public," and that if that happened, the result would be a significant return on Vanguard's investment. Furthermore, Mr. Mathes stated that he had no reason to disbelieve Mr. Taylor. In fact, he stated that one of the reasons Vanguard ultimately went ahead with Mr. Taylor's consolidation proposal was because "he [Mr. Taylor] had ... indicated that it was such a good investment to get into.";

(8) Despite Plaintiff's contentions that it was forced to purchase "worthless" stock, *one year* after the purchase Plaintiff used the allegedly worthless stock as collateral for a $200,000.00 loan from Commercial Bank;

(9) One year later (*two years* after the stock purchase) having repaid the $200,000.00 loan at Commercial, Plaintiff again used its "worthless" stock as collateral for a $350,000.00 line of credit with Commercial Bank;

(10) For more than two years after the purchase of the stock, Plaintiff showed it as a $1,000,000.00 asset on its financial statements which were given to the banks; and

(11) Plaintiff never complained to anyone inside or outside Midland that it was forced to buy stock that it did not want. Conversely, Mr. Mathes would frequently call and inquire about the stock's potential for going public. It was not until after Commercial Bank determined that the stock's value was not sufficient to support the line of credit it had extended to Vanguard and therefore, called its loan due, that Plaintiff filed this lawsuit.

Obviously, this Court cannot know exactly what Mr. Mathes was thinking, or what his intentions were at the time he decided Vanguard would go ahead with the stock purchase. Therefore, the Court is relegated to deduce, based upon what happened before, during, and after the allegedly coerced transaction, whether or not Plaintiff was stripped of its free will and forced to do something it would not have otherwise done. In light of the facts as set forth above, and considering all the surrounding circumstances, it is this Court's finding that Plaintiff has not proven by a preponderance of the evidence that Defendant deprived Plaintiff of its free will and forced it to purchase the stock.

## V. *CONCLUSION*

The Court sympathizes with Plaintiff. After all, it lost $1,000,000.00 on the purchase of Midland Bancor stock. The problem is that millions are frequently lost through the failure of various stocks and there is no cause of action for merely having lost money through ill-advised stock purchases. Granted, Plaintiff was in a precarious position at the time of the stock purchase. However, the evidence simply does not establish that Vanguard was forced into the transaction at issue,[8] or that Defendant performed a wrongful act which created the financial crisis Plaintiff was experiencing at the time of the sale.

Accordingly, it is hereby **ORDERED** that judgment be entered in favor of the Defendant on Count III of Plaintiff's Third Amended Complaint.

**IT IS SO ORDERED.**

---

8. Plaintiff needed money, Midland had no obligation to loan Plaintiff any money, and Defendant wanted to sell some stock. As such, the evidence does indicate that Midland was in a superior bargaining position, however, a position of economic superiority obviously does not in and of itself equate with resulting economic duress.