Danny and Edwina SLONE, Appellants–
Respondents,

v.

PURINA MILLS, INC., Respondent–
Appellant.

Nos. WD 51597, WD 51650.

Missouri Court of Appeals,
Western District.

June 4, 1996.

As Modified July 25, 1996.

Motion for Rehearing and/or Transfer to
Supreme Court Denied July 30, 1996.

Application to Transfer Denied
Sept. 17, 1996.

John Alan Ruth, Jefferson City, for Appellants/Respondents.

Hallie H. Gibbs, Jefferson City, for Respondent/Appellant.

Before FENNER, C.J., P.J., and ELLIS and EDWIN H. SMITH, JJ.

FENNER, Chief Judge.

Danny and Edwina Slone appeal from the trial court's entry of partial summary judgment in favor of Purina Mills, Inc. ("Purina"), in the Slones' action for damages incurred as a result of Purina's alleged breach of a Sales and Distribution agreement between the parties, tortious interference with business expectancies, and fraudulent misrepresentation. The Circuit Court of Cole County certified the entry of partial summary judgment as final and appealable. Purina also cross-appeals the partial denial of its motion for summary judgment.

A significant factual background is necessary to properly assess this appeal. The facts are presented in the light most favorable to appellants. *State ex rel. Conway v. Villa*, 847 S.W.2d 881, 886 (Mo.App.1993). Appellants' relationship with Purina dates back to 1971, when Danny Slone worked for his father's Purina feed dealership. In 1975, the Slones took over operation of the dealership, named Slone Feed, from their family farm. At the encouragement of Purina, the Slones expanded their dealership by purchasing a feed mill in Tuscumbia, Missouri, and moving the dealership from their family farm.[1] The newly formed dealership at the mill was named GHS Farm Services ("GHS"). Part of the impetus for the expansion of the Slone's dealership was Purina's desire to tap the turkey-producing market in Miller County, Missouri. Danny Slone stated that one of the main reasons he decided to

purchase the mill was the representation from Walt Reece, a Purina Territory Manager, that "[Purina] need[s] to get in the turkey business. We are going to support you. We are going to get you in the turkey business." Prior to this time, the Slones primarily sold cattle, hog, and dairy feed products to the local farmers.

In 1984, a representative from Purina's St. Louis office approached Danny and asked how Purina and GHS could increase their turkey feed sales to the farmers in Miller County. At the time, GHS was operating as a Purina dealership through an oral agreement between the Slones and Purina; no written franchise agreement or any other written contract existed at the time between the Slones and Purina. GHS was not selling much turkey feed at the time because most of the turkey farmers in Miller County operated as "contract growers." Under a "contract grower" relationship, the farmer raises turkeys for the turkey producer, but the turkey producer owns the birds and supplies all the feed for the turkeys. The producer purchased the poults (baby turkeys) and guaranteed each farmer a certain price for each turkey raised, with the farmers only providing labor and utilities for raising the turkeys. To expand their business in Miller County, Purina and the Slones agreed that they would have to find more advantageous growing contracts for farmers in the area.

In the summer of 1984, Purina reached an agreement with the Iowa Turkey Producers ("ITP"), a turkey processor, by which ITP would sign independent contracts with Missouri farmers to raise turkeys. Albert Bray, Purina's Turkey Chow Sales and Procurement Manager, contacted Danny Slone to inquire as to whether Danny could persuade some Miller County farmers to travel with he and Danny to Iowa to meet with ITP representatives. Danny knew some of the farmers were not satisfied with the way their current producer company had been treating them, and agreed to identify and solicit those who might be interested in the ITP contract.

---

1. The feed mill had previously been operated with no affiliation with a feed company. The prior owners ground their own feed. Upon pur-

chase by the Slones and their partners in GHS Farm Services, the mill became a Purina dealership.

One Miller County farmer agreed to travel with Danny and Bray to meet the ITP representatives. During this meeting, appellants claim that Danny participated in actual negotiations regarding the terms for placement of turkeys by ITP in Miller County. A copy of the contract was eventually brought into the Slones' dealership, and Danny answered questions and helped negotiate some terms in the contract between the farmers and ITP.

Three Miller County farmers signed ITP contracts. Unlike previous contracts, this independent contract allowed the farmers to purchase their own feed for the turkeys.[2] Consequently, the ITP contract was beneficial to both Purina and the Slones, as the growers purchased feed from the Slones dealership out of a sense of loyalty to those who brought them the contract. One of the farmers, Larry Albertson, stated that "but for the association of Danny Slone's honesty and integrity with the turkey growing contracts I entered into, I would not have signed the contracts with total strangers." The growers placed feed orders with the Slones, who purchased feed from Purina and transported it to Miller County from Purina's plant in Montgomery City. When it was apparent that the three farmers were going to sign the ITP contracts, the Slones purchased a new delivery truck to accommodate the deliveries to the turkey farms. The three farms each grew approximately 70,000 turkeys a year, operations considered small in the turkey industry.

During the ITP contracts, the farmers would call Edwina Slone when they were nearly out of feed. Edwina calculated the types and amounts of feed the farmers required, depending on what stage each flock of birds was in at the time. Edwina would call in the order and it would be delivered to the farms. Purina did not pay for these services; instead, the Slones profited by marking up the price of feed to offset the expenses of transporting and selling the feed.

Bray informed the Slones that they could not mark up the turkey feed more than $21.00 per ton at first, then reduced that amount to $17.00 per ton. Dick Jones, Purina's Manager of Financial Services, acknowledged that he may have participated in a meeting with Bray and Danny at which time Danny was told how much he could mark up the feed.

Bray remained in personal contact with the farmers, visiting them once every ten to fourteen days. The Slones, as Purina's local dealer, provided services on a daily basis to the farmers to assist them in their turkey growing operations, including repairing feed lines, taking fat samples, making sure medication was available for sick birds, transporting sick turkeys to Columbia, preparing the loader for use when the birds went to market, repairing the loader, advising farmers regarding production schedule dates, keeping growth and feed charts for each flock, and maintaining books on the various levels of feed required for each flock.

About half-way through the term of the ITP contract, Bray approached the Slones with a document entitled "Purina Mills, Inc. Sales and Distribution Policy," claiming that Purina was requiring all dealers to sign the agreement. The Slones were initially reluctant to sign the agreement because of language in the next-to-last paragraph that states:

> Purina prefers that feeding operations buy from a local Purina dealer. Some very large operations may not need any of the services provided by a Dealer and will not pay for services not used. Purina intends to help Dealers sell those large accounts where it seems reasonable. *In cases where the large feeding operation will not buy from the dealer, Purina reserves the right to sell to those operations.* When dealer services are needed by these large operations, the dealer will be encouraged and invited to negotiate for providing these services.

> Also, under an independent contract, the farmers had to actually purchase the poults, feed them, and pay for the processing costs with no assurances of how much money he or she will make on the adult turkeys. The farmer assumes the risks of loss rather than the producer.

2. The three farmers had previously grown turkeys for Cargill. Cargill is also a feed supplier. Not surprisingly, Cargill supplied the farmers with Cargill feed for the turkeys they raised. The farmers did not have the option to purchase Purina feed from the Slones to feed their turkeys under the Cargill contracts.

The Slones were concerned that this language would allow Purina to start selling feed directly to the Slones' customers, taking away their business. Bray assured the Slones on a number of occasions that Purina would never sell feed directly to the turkey farmers. As a result, the Slones executed the document on July 23, 1985.

The ITP contracts lasted through the fall of 1985 and were not renewed thereafter. No dispute exists as to the relationship between Purina and the Slones under the ITP contracts.

Danny Slone and Albert Bray contacted Land–O–Lakes and Bilmar in an attempt to find a new contract for the Miller County farmers after the ITP contract ended, but were unsuccessful. Carl Nethers, Purina's Director of the Meat Bird Group, discovered the availability of a Beatrice Foods ("Beatrice") turkey growing contract about this time and passed word of its availability to the Montgomery City office. The Beatrice contract, like that executed with ITP, was an independent contract.

Additional farmers in Miller County had come to the dealership asking about the ITP contracts because the farmers who grew turkeys under them had apparently made a considerable amount of money. When the Beatrice contract became available, Danny was asked by Bray if he knew of any more growers who would be willing to sign on as the Beatrice contract called for more birds than the ITP contract. Danny met with Dick Wolfe, Beatrice's Flock Supervisor, at the Slones' dealership to discuss the specifics of the contract, how many turkeys Beatrice wanted to place in Miller County, and how many farmers were needed under the contract. Danny then began contacting potential growers and setting up meetings between the growers, himself, Bray, and Wolfe. Nobody at Purina, including Bray, knew three of the four additional turkey farmers that Danny solicited for the Beatrice contract. Bray marketed the contract with the provision that the Slones would be providing the feed for the farmers.

The Slones ordered, delivered, and billed the feed for the Beatrice farmers as they had for the ITP farmers. Again, they were instructed by Bray that they could not mark up the feed more than $17.00 per ton. The Slones also continued to provide dealer services to the turkey farmers.

During the Beatrice contract, in conversations with the Slones regarding the increasing volume of feed that needed to be hauled to the farmers, Bray suggested that it might be helpful if the Slones purchased a second delivery truck. The Slones purchased a used truck from a friend of Bray's for $29,000 in the spring or summer of 1986.

Also during the term of the Beatrice contract, Danny attended a meeting sponsored by Purina in Hawaii. At this meeting, Danny encountered discussions regarding Purina's system of selling feed directly to farmers rather than through dealers. Upon returning to Missouri, Danny asked Bray about the discussions and was again assured that Purina would not sell direct to the farmers as long as Bray was Danny's area representative. Bray does not dispute making such a statement to Danny on a number of occasions.

The Beatrice contract ran from the fall of 1985 to the fall of 1986. There is no dispute between the parties arising out of their relationship during the Beatrice contract.

During the term of the Beatrice contract, Beatrice Foods came to be known as Swift–Eckrich, Inc. ("Swift–Eckrich"). In the fall of 1986, as the Beatrice contract was about to expire, Purina secured another agreement with Swift–Eckrich under which a three-year, independent turkey growing contract would be offered to the same farmers who had raised turkeys under the Beatrice contract. At Danny's urging, an eighth farmer was allowed to sign an independent growing contract with Swift–Eckrich.

Danny Slone's role in enlisting the farmers on the Swift–Eckrich independent contracts was the same as that performed with regard to the ITP and Beatrice contracts—he met with farmers, Bray, and Wolfe, going over the contract and helping answer some of the farmers' questions about the contract. The Slones' participation in servicing the Swift–Eckrich independent contracts was also identical to their participation in servicing the

farmers' needs under the ITP and Beatrice contracts, including the limitation of the feed mark-up as mandated by Bray. Purina acknowledges that no dispute exists in this action regarding the Slones's relationship with Purina as a local dealer for the turkey farmers bound by the three-year Swift–Eckrich independent turkey growing contracts that ran from 1986 to 1989.

Four weeks after the eight turkey farmers had signed the Swift–Eckrich independent contracts, Bray approached Danny and informed him that Swift–Eckrich had more birds available for Miller County, as Purina had struck another deal for the additional birds. Gus Opfer, Purina's Division Sales Manager, had contacted Bray, informed him that some of the birds could be placed in Miller County, and advised Bray that the terms of the contract would be the "same as what it had been previously." Bray asked Danny if he could locate additional growers for the contract and assured Danny that the feed would go through him and that the contract would be "run" exactly like the three-year contract with the other growers.

The new contract was labeled a "pass-through" contract rather than an independent contract, however, with Purina actually signing the contract with the turkey producer (Swift–Eckrich) rather than the farmer signing with the producer, and then passing the responsibility for raising the turkeys on to the farmers. Purina essentially served as a strawman between the turkey processor and the turkey farmer in order to claim ownership of the turkeys and control the feed that was purchased for the turkeys. Once the turkeys were sent to market, the turkey processor paid Purina for the birds in a farmer specific fashion, with Purina passing money on to the farmers for raising the turkeys.

Danny was successful in soliciting seven additional farmers to sign the pass-through contracts after he received Bray's assurance that the feed would be sold through him as it had in the past. Additionally, the Slones themselves signed on to grow turkeys under the pass-through contract. The Slones knew of the different characterization of the contract as a pass-through contract, but claim they were under the impression that they would continue to process the feed orders, pick-up and deliver the feed, provide all necessary services to the farmers, and be paid according to their dealer mark up as they had with the previous contracts pursuant to the representations of Bray and Opfer. The pass-through contract was also to run for three years.

Three to four weeks after the farmers had been recruited for the pass-through contract, Opfer was informed by Purina representatives in St. Louis that the Slones would not be selling feed under this contract, as Purina desired to sell the feed directly to the farmers from its Montgomery City mill. Carl Nethers called Opfer and Bray to inform them that Purina could not afford for the farmers to purchase feed from the Slones. After Bray objected, Nethers informed him that the decision to sell direct had been made. A memorandum from David L. Abbott, Purina's Regional Sales Manager, to Opfer dated January 5, 1987, explained that the expansion in Miller County using the pass-through contracts was intended to be a direct program all along and that there was "some concern about the way the expansion program was positioned to Slone ... to be similar to the old program ... [which] apparently set [Purina] up for the problems [Purina] encountered."

Purina approached the Slones to see if they would be willing to change the process so that Purina could sell the turkey feed directly to the pass-through farmers after Bray had assured the Slones on several occasions through the years that they would service additional farmers as they had serviced farmers under the prior contracts. When the Slones refused, Purina took additional measures, which it does not deny, to attempt to convince the Slones to change their position.

In early November 1986, Bray went to the Slones' dealership and asked Danny to accompany him on a ride in the country. During the ride, Bray informed Danny that Purina, in its effort to sell direct, had hired Riddle Trucking to haul all the feed to the farmers at $9.00 per ton, cutting the Slones out of the feed hauling loop for the pass-

through farmers. After Danny called the Montgomery City office to find out why Purina had decided to do this, Jones, Opfer, and Bray came to the dealership to discuss the matter with the Slones. After being informed of a problem in the system with one farmer who was growing under both the direct and pass-through contracts, the Purina representatives admitted not thinking of the problem, but stated "that's the way it is" and that the Slones were not to haul feed to the pass-through growers.

Soon thereafter, Opfer contacted Danny and asked him to come to Jefferson City to meet with himself, Bray, Jones, and another Purina representative, Tom Sheppard. At this meeting, the Purina representatives informed Danny that he must agree to take a $1.00 per ton service fee on each ton of feed Purina sold directly to the pass-through farmers rather than the $17.00 per ton mark-up he received under the direct contract. Danny refused to accept the arrangement at the meeting and returned home.

The Slones continued to operate their dealership as if none of the discussions had occurred. The Slones stated that they did not want the pass-through farmers to become nervous or think that the pass-through program was different than presented to them at the time they signed the contract. The Slones continued business as usual, calling in the pass-through farmers' feed orders and delivering the feed.

A few days after the Jefferson City meeting, Bray and Sheppard arrived at the dealership in the morning. After being informed by Danny that he was not going to agree to any service fee arrangement, Bray and Sheppard spent the day standing in the corner of the business whispering, leaving occasionally to speak outside the business and use a pay telephone down the street. They did not speak with the Slones for the rest of the day. Next, Purina resorted to having Sheppard, Opfer, and Bray call the Slones at home in the evenings to plead with them to agree to the direct sales arrangement. This was also to no avail.

During the last week of November 1986, Opfer arrived at the dealership after renting a motel room in town and followed the Slones around all day, each day, for an entire week, constantly asking them to agree to the service fee arrangement. During this week, Opfer threatened the Slones by telling them that Purina had a man prepared to move to Miller County for $30,000.00 per year to provide the services Purina wanted the Slones to provide under the service fee arrangement. Eventually Opfer raised the service fee offer to $2.00 per ton, which Danny refused. The Slones' deposition testimony was that they felt they were being harassed and intimidated by Opfer and that he was trying to "beat them down" until they would accept the service fee arrangement. Finally, at the end of the week, Danny went to retrieve a delivery truck that was being serviced at a business in Jefferson City. Opfer followed Danny to the business and, without warning, climbed into the cab of the truck with Danny. Opfer told Danny he was not going to leave them alone until they agreed to the service fee arrangement. After rejecting Opfer's offer of $3.00 per ton, Danny agreed to a $4.00 per ton service fee arrangement "to get [Opfer] off the place, to get him out of my hair."

The Slones testified they felt forced into signing the service fee agreement. They were afraid of losing their other Purina business in addition to the pass-through business, as they continued to service the direct contract farmers and provide Purina feed products and service for other livestock. In order to confirm what services the Slones were to provide under the service fee agreement, Edwina asked Purina to put the expected services in writing. The writing in response consisted of a letter from Opfer outlining the responsibilities of each party. With the exception of transporting feed, the duties the Slones provided under the service fee arrangement were the same as those provided by the Slones under the Swift–Eckrich direct contract and the Beatrice and ITP contracts. Additionally, when a pass-through farmer ran out of feed or required a small load of feed, Purina allowed the Slones to transport those loads.

Additionally, at the beginning of the pass-through contract during the time the Slones refused the service fee agreement, Purina did not know how much mark-up to add to

the sales tickets because of the dispute with the Slones. Instead of paying the Slones under the prior arrangement, Purina withheld the Slone's invoices in Montgomery City for four months, refusing to pay them.

Purina alleged that market conditions in the turkey industry caused the need to implement the service fee arrangement. No proof of the affect of the turkey market conditions at that time on Purina's contracts and business has been presented. Purina did, however, hire someone else to provide the delivery services under the pass-through contract that the Slones provided under the previous contracts. Purina representatives claim profits or losses under individual turkey growing contracts are not maintained, as any such profit or loss would be aggregated with the profits or losses of the Montgomery City mill.

After grudgingly accepting the $4.00 per ton service fee arrangement, the Slones continued to provide services throughout the three year period of the pass-through and direct contracts with Swift–Eckrich. At the conclusion of these contracts, Swift–Eckrich did not offer new contracts for Miller County.

Mike Krakoviak, Purina's Division Sales Manager at the time, successfully located a replacement contract for the Miller County farmers with Bilmar that was similar to the Swift–Eckrich pass-through contracts. Purina ignored the Slones in establishing this contract. Bray testified that he was told by his superiors not to contact the Slones with regard to participating in the Bilmar contract. After serving as the local dealer who introduced and helped solicit Miller County farmers for turkey production, the Slones were cut out of Purina's turkey feed business in Miller County. When Danny asked Purina representatives questions regarding the contract and his participation, he was informed that no margin existed for his participation and that Purina did not require his services. Nonetheless, Purina did hire Dee Riemensneider, who was not a Purina dealer, to call in the farmers' orders at $.50 per ton and paid Riddler Trucking and Riemensneider Trucking to transport all the feed. This was done despite Krakoviak's promise to pay

the Slones if anyone was paid to call in the farmers' feed orders.

A clause in the Bilmar contract specifically required the farmers to buy all their feed from Purina directly, and that they could not purchase it from another source. At the beginning of the contract, Bray approached the farmers, all of whom had been originally solicited in part by Danny Slone, and told them to cease ordering any feed from the Slones.

Because of the loss of the turkey feed business coupled with the servicing of $200,000.00 debt on two delivery trucks and a feed mill, the Slones were forced to close the dealership and seek employment elsewhere. The Slones never received notice from Purina that Purina terminated the Slones' dealership.

The Slones filed their petition for damages in 1991. Purina filed a motion for summary judgment on December 8, 1993. This motion was denied by order on May 31, 1994. On May 19, 1995, two months before the set trial date of this action, Purina filed a second motion for summary judgment, alleging essentially the same grounds for relief and adding three additional exhibits for the court's consideration: Purina's Sales and Distribution Policy, the letter from Opfer to the Slones outlining services under the service fee agreement, and the affidavit of Dick Jones. The trial court granted Purina's motion for summary judgment on the Slones' claims of breach of contract, tortious interference with a business expectancy as to the Swift–Eckrich growers, and fraudulent misrepresentation while denying Purina's motion as to the Slones' claim of tortious interference with a business expectancy related to the Bilmar contract. Both parties timely appealed the court's order.

## I. THE SLONES' APPEAL

### A. Standard of Review

The Missouri Supreme Court provided an exhaustive analysis of summary judgment practice and review in its opinion in *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.*, 854 S.W.2d 371 (Mo. banc 1993). Appellate review of summary judg-

ments is essentially *de novo.* *Id.* at 376. The criteria on appeal for testing the propriety of summary judgment are no different than those which the trial court should have employed initially. *Id.* As the trial court's initial judgment is founded on the record submitted and the law, there is no need for the appellate court to defer to the trial court's granting of the summary judgment motion. *Id.*

When considering the appeal, the Court will review the record in the light most favorable to the party against whom judgment is sought. *State ex rel. Conway v. Villa,* 847 S.W.2d 881, 886 (Mo.App.1993). The movant bears the burden of establishing a right to judgment as a matter of law on the record as submitted; any evidence in the record that presents a genuine issue as to the material facts defeats the movant's prima facie showing. *ITT Commercial Fin.,* 854 S.W.2d at 382. A "genuine issue" exists where the record contains competent material that evidences two plausible, but contradictory, accounts of the essential facts. *Id.* A "genuine issue" is a dispute that is real, not merely argumentative, imaginary, or frivolous. *Id.*

The non-movant is accorded the benefit of all reasonable inferences from the record. *Martin v. City of Washington,* 848 S.W.2d 487, 489 (Mo. banc 1993). If the movant requires an inference to establish his right to judgment as a matter of law and the evidence reasonably supports an inference other than that alleged by movant, a genuine dispute exists and the movant's prima facie showing fails. *ITT Commercial Fin.,* 854 S.W.2d at 382.

With regard to Purina's motion for summary judgment, Purina is a "defending party" in the underlying action while the Slones are the "claimant." A summary judgment movant who is a "defending party" may establish a right to summary judgment by showing any one of the following: (1) facts that negate any one of the claimant's facts required to establish an element of claimant's claim; (2) the non-movant, after a reasonable period for discovery, has not and will not be able to produce evidence for the trier of fact

to find the existence of any one of the claimant's elements; or (3) that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's properly-pled affirmative defense. *ITT Commercial Fin.,* 854 S.W.2d at 381.

Only once the movant has satisfied one of the three grounds for establishing a right to judgment is the non-movant required to set forth specific facts showing there is a genuine issue of material fact. *Id.* (*citing* Rule 74.04). Once the movant makes a prima facie showing, an adverse party may not rest upon the mere allegations or denials contained in their pleadings to contradict facts alleged by the movant. *Id.*

## B. Breach of Contract

The trial court granted Purina's motion for summary judgment on the Slones' breach of contract claim on the basis that the Sales and Distribution Policy created no more than a non-exclusive dealership arrangement. Further, the trial court concluded that the negotiation, acceptance, and performance of the service fee agreement caused an abandonment or replacement of the Sales and Distribution Policy. We believe the trial court erred in reaching these conclusions.

To establish a breach of contract claim, the Slones must prove each of the following elements:

1) the making and existence of a valid and enforceable contract between the Slones and Purina;

2) the rights of the Slones and the obligations of Purina thereunder;

3) a violation thereof by Purina; and

4) damages resulting from the breach.

*See Gilomen v. Southwest Mo. Truck Center,* 737 S.W.2d 499, 500–01 (Mo.App.1987). Purina argued, and the trial court agreed, that the Slones could not satisfy the first element of analysis for a breach of contract.

Purina contended that because the Sales and Distribution Policy did not grant the Slones an exclusive dealership, Purina is entitled to a judgment as a matter of law on the breach of contract cause of action. The

Slones acknowledge that they were not granted an exclusive dealership in the Miller County area and that other Purina dealers in the area competed with them. It is not these dealers, however, with which we are concerned in this action.

Missouri law implies a covenant of good faith and fair dealing in every contract. *Morton v. Hearst Corp.*, 779 S.W.2d 268, 273 (Mo.App.1989). It is the duty of one party to a contract to cooperate with the other to enable performance and achievement of the expected benefits. *McKnight v. Midwest Eye Institute of Kansas City, Inc.*, 799 S.W.2d 909, 914–15 (Mo.App.1990). The Slones alleged that language in the Sales and Distribution Policy barred Purina from competing with them and selling directly to the farmers in question and that Purina's actions in doing so violated the covenant of good faith and fair dealing implied into the contract created by the mutual execution of the Sales and Distribution Policy. The pertinent language in the Sales and Distribution Policy reads as follows:

> Purina Mills, Inc. has established as its primary form of distribution local, independent Dealers which are appointed on the basis of potential in each market.

> To achieve mutual long-lasting success in individual markets, Purina and the local Purina Dealer must agree on the teamwork and cooperation required to achieve acceptable volume levels.

> It is our firm belief that Purina Mills, Inc. and its authorized Dealers have fundamental obligations to each other.

> In fulfilling its responsibilities, Purina Mills, Inc. will:

> Conduct business in a moral, legal and ethical manner.

> Provide a trained District Manager to assist the Dealer in the growth and development of the Dealer's business.

> . . . .

It is recognized that the above responsibilities may evolve and change over time as market conditions change. Purina will notify Dealers of changes as soon as practical.

> Purina dealers prefer that feeding operations buy from a local Purina Dealer. Some very large operations may not need any of the services provided by a Dealer and will not pay for services not used. Purina intends to help Dealers sell these large accounts where it seems reasonable. In cases where the large feeding operation will not buy from the Dealer, Purina reserves the right to sell to those operations. When Dealer services are needed by these larger operations, the dealer will be encouraged and invited to negotiate for providing these services.

The Slones claim that even though they were not an exclusive dealership, Purina violated the Sales and Distribution Policy by failing to provide teamwork with its dealer, failing to cooperate with its dealer, failing to assist the dealer in the growth and development of the dealer's business, failing to conduct business in a moral, legal, and ethical manner, and by selling feed directly to the dealer's customers who were not "very large operations" and who had not refused to purchase feed from the local dealers.

The language of the Sales and Distribution Policy created a contractual relationship between the parties regardless of the fact that the Slones were not granted an exclusive dealership. This is not a case of two dealerships competing against each other. The question presented by the facts of this case is whether the parent company can compete directly with its dealer under the dealership agreement. Given the fact that the Sales and Distribution Policy only reserved Purina the right to sell directly to "very large operations" who will not buy from the dealer, there is, at the very least, a question of material fact as to whether Purina could compete with the Slones by selling directly to farmers who may not be considered "very large operations" and who did not refuse to buy from the dealer.[3] Further, we believe there are

---

3. Danny Slone testified that the Miller County turkey farms would not be classified as "very large" in the industry. This testimony was not refuted or challenged by Purina.

The record also reveals that none of the Miller County farmers refused to purchase feed from the Slones or that the Slones were unable to

questions as to whether Purina complied with the requirements of the agreement in providing teamwork and cooperation with the Slones, assisting the Slones in the growth of their business, and in conducting itself in a legal, ethical, and moral manner.

The fact that the Sales and Distribution Policy conferred nothing more than a nonexclusive dealership to the Slones does not entitle Purina to judgment as a matter of law, as there is a genuine issue of fact as to whether Purina's actions constituted a breach of the covenant of good faith and fair dealing implied into the Sales and Distribution agreement.

Purina also contends that it was entitled to judgment as a matter of law because the service fee agreement between the parties superseded any duties owed under the Sales and Distribution Policy. Purina cites *Ragan v. Schreffler*, 306 S.W.2d 494, 498 (Mo.1957), for the principle that those who make a contract may unmake it or substitute another, either wholly or partially inconsistent, and if the second contract be valid it will supersede or modify the first to the extent that the two cannot stand together. The trial court concluded that the "undisputed facts in this case support [Purina's] position that any contractual rights relating to the sale of feed to turkey growers arising from the Sales and Distribution Policy, if any, no longer existed by virtue of the abandonment and replacement of the Sales and Distribution Policy with the negotiated service fee agreement."

To conclude that the service fee agreement completely superseded the Sales and Distribution Policy is a leap in logic not supported by the evidence. Unlike the situation in *Ragan* where the two contracts dealt with the same subject matter, the service fee agreement applied only to the eight pass-through farmers while the Slones continued to provide services to the direct contract turkey farmers and other livestock farmers in the area. At best, the service fee agreement is a modification of any inconsistent terms in the Sales and Distribution Policy as to the eight pass-through farmers. Purina was operating under the Sales and Distribu-

adequately service the farmers, as far as the

tion Policy at the time it was "negotiating" the service fee agreement with the Slones. Given Purina's actions in "negotiation," we believe there is a question of fact as to whether Purina complied with the terms in the Sales and Distribution Policy requiring Purina to conduct itself in a legal, moral, and ethical manner, cooperate and work as a team with the dealer, and assist the Slones in the growth of their dealership.

 The trial court's finding of abandonment is also not supported by the evidence in the record. A finding of abandonment of a contract requires that the act and conduct of the parties must be unequivocal, positive, and inconsistent with the existence of the contract. *Tudor v. Tudor*, 617 S.W.2d 610, 613 (Mo.App.1981). The Slones continued to service all farmers other than the pass-through farmers consistent with the terms of the Sales and Distribution Policy even after they were convinced to enter the service fee agreement. Even under the service fee agreement, the Slones' service to the eight pass-through farmers was the same as to the other turkey farmers who were served under the Sales and Distribution Policy except for the actual hauling and delivery of feed. A finding of abandonment of the Sales and Distribution Policy is not supported by the facts of this case.

The trial court erred in granting Purina's motion for summary judgment as to the Slones' breach of contract claim.

**C. Tortious Interference with a Business Expectancy—Swift–Eckrich Pass–Through Farmers**

 In order to establish a cause of action for tortious interference with a business relationship or expectancy, the claimant must prove each of the following five elements:

1) a contract or valid business relationship or expectancy;

2) knowledge by the defendant of the contract or relationship;

farmers were concerned.

3) intentional interference by defendant which induces breach of the contract or relationship;

4) absence of defendant's justification; and

5) resulting damages.

*Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 316 (Mo. banc 1993). A plaintiff bears the burden of proof and must adduce substantial evidence supporting each and every element of this cause of action. *SSM Health Care, Inc. v. Deen*, 890 S.W.2d 343, 346 (Mo.App.1994).

■■■ There is no dispute that the Slones did not have a contract with the growers or Swift–Eckrich. The question of the validity of the Slones' claim, and the propriety of summary judgment against them, is centered on the issue of whether they had an enforceable business expectancy to sell turkey feed to growers raising turkeys under the Swift–Eckrich pass-through contracts.

■■■ The Slones correctly point out that Missouri courts recognize that a regular course of similar prior dealings suggests a valid business expectancy. *American Business Interiors, Inc. v. Haworth, Inc.*, 798 F.2d 1135, 1143 (8th Cir.1986) (*citing Rusk Farms, Inc. v. Ralston Purina Co.*, 689 S.W.2d 671, 679 (Mo.App.1985). Applying this principle to their case, the Slones claim that they had developed a reasonable expectation of commercial relations with the Miller County turkey farmers they had previously solicited for Purina and with other Miller County residents who had purchased Purina products from the Slones in the past.

Whether such a reasonable expectation of commercial relations existed might well be a genuine issue of material fact preventing summary judgment in most cases; however, in the case at bar, Purina argues that by accepting and fulfilling the service fee arrangement, the Slones contracted away any business expectancy inconsistent with the service fee arrangement as to the Swift–Eckrich pass-through farmers. As stated in the preceding section, the service fee agreement is a modification of the Sales and Distribution Policy as to the eight Swift–Eckrich pass-through farmers. We believe Purina is correct in asserting that the service fee agreement, which provided a $4.00 per ton service fee to the Slones for each ton of feed purchased directly from Purina by the turkey farmers, supplanted any expectancy the Slones had to sell the feed to the farmers through the dealership.

The Slones claim that the service fee agreement did not vitiate their expectancy to sell feed to the farmers to the dealership for two reasons. First, the Slones argue that Purina's intentions were to sell feed directly to the pass-through farmers from the time the contract was initiated and they had hired other parties to provide feed hauling services before ever informing the Slones that they would not be providing feed to the farmers through the dealership, and that the service fee arrangement was an afterthought by Purina to attempt to appease the Slones for the breach of the dealership agreement. Because of this situation, the Slones claim the service fee agreement cannot justify Purina's direct sale to the farmers and supplant the Slones' expectancy to sell feed to the turkey farmers through the dealership.[4] We disagree. Unless the Slones can establish that the service fee agreement is invalid, the fact that they agreed to its terms knowing of Purina's actions did away with any expectancy to sell feed to the turkey farmers through the dealership.

■■■ The Slones do, however, claim that the service fee arrangement was invalid because it was procured through coercion, duress, and undue influence. Whether the facts alleged are sufficient to support a claim of duress is a question of law for the court.[5] *Burch v. Fluor Corp.*, 867 F.Supp. 873, 878 (E.D.Mo.1994). Under Missouri law, the central question with respect to duress is whether, considering all surrounding circumstances, one party to the transaction was

---

4. The Slones cite no law for this proposition.

5. Whether the alleged facts actually exist is a matter for the fact finder, *Burch v. Fluor Corp.*, 867 F.Supp. 873 (E.D.Mo.1994). In this case, Purina does not dispute the existence of any of the alleged conduct on which the Slones base their argument for duress.

prevented from exercising his free will by threats or wrongful conduct of the other. *Vanguard Packaging, Inc. v. Midland Bank,* 871 F.Supp. 348, 352 (W.D.Mo.1994); *Andes v. Albano,* 853 S.W.2d 936, 942 (Mo. banc 1993); *Schmalz v. Hardy Salt Co.,* 739 S.W.2d 765, 768 (Mo.App.1987). Conduct cannot constitute duress unless it is wrongful; it is not duress to do, or to threaten to do, what one has a right to do. *Gustin v. F.D.I.C.,* 835 F.Supp. 503, 508 (W.D.Mo. 1993). Silence and acquiescence for a considerable period after an agreement is allegedly executed under duress, action in accord with it, and acceptance of the benefits under it amount to a ratification of the agreement. *Schmalz,* 739 S.W.2d at 768.

 One of the Slones' primary allegations of duress was the threat communicated by Opfer to place another dealer in the area, paid at $30,000 per year, to replace the Slones. Fatal to the Slones' argument on this point is the fact that the nonexclusive dealership agreement that the Slones admit existed between Purina and themselves does not prohibit Purina from placing another dealer in the area. According to the law, there is no duress in this act because Purina is threatening to do what it has a right to do.

 With regard to the remainder of the Slones' argument and the numerous acts of "negotiation" employed by Purina representatives, while we find Purina's acts deplorable, the facts in the record reveal that the Slones did enter into the service fee agreement, requested the terms in writing, acquiesced to the terms as presented by Purina for the period of the agreement, took action in accordance with the agreement, and received benefits under the agreement for nearly three years until the pass-through contracts expired. Under the principles announced in *Schmalz,* the Slones' actions amounted to a ratification of the agreement.

The execution of the service fee agreement between the Slones and Purina vitiated any business expectancy the Slones had in selling turkey feed through their feed dealership to the pass-through farmers. Though Purina's tactics in convincing the Slones to enter the service fee agreement were questionable at best, the Slones' actions in performing and receiving the benefits of the agreement ratified it, doing away with any claim of duress. The trial court did not err in granting Purina's motion for summary judgment with regard to the Slones' claim of tortious interference with a business expectancy as to the Swift–Eckrich pass-through farmers.

### D. Fraudulent Misrepresentation

 A cause of action for fraud or misrepresentation requires a claimant to prove each of the following elements:

1) a representation;
2) its falsity;
3) its materiality;
4) the speaker's knowledge of its falsity or his ignorance of the truth;
5) the speaker's intent that his representation should be acted upon by the hearer and in the manner reasonably contemplated;
6) the hearer's ignorance of the falsity of the representation;
7) the hearer's reliance on the truth of the representation;
8) the hearer's right to rely thereon; and
9) the hearer's consequent and proximately caused injury.

*Clark v. Olson,* 726 S.W.2d 718, 719 (Mo. banc 1987). The failure to establish any one of the elements of fraud is fatal to recovery. *Heberer v. Shell Oil Co.,* 744 S.W.2d 441, 443 (Mo. banc 1988). The trial court centered on the statements made by Bray as the misrepresentation and found that Bray's statements were not material, that the Slones did not rely to their detriment on them, and any reliance on Bray's statements would not be reasonable as a matter of law because the Sales and Distribution Policy provided that there might be circumstances in which feed sales would not be made through the dealership. The trial court also stated that by entering into the service fee agreement, the Slones waived their right to sue for fraud.

Before addressing the court's actual ruling, we must determine the scope of the Slones' fraudulent misrepresentation claim. As part of their argument to this court, the Slones claim the trial court erred in focusing solely

on the representations of Bray related to the Swift–Eckrich pass-through contracts in assessing their fraudulent misrepresentation claim. Their argument states that "in an effort to plead the ultimate facts and to 'invoke substantial principles of law which entitles [the Slones] to relief and inform [Purina] of what [the Slones] will attempt to establish at trial,' *Kantel Communications, Inc. v. Casey*, 865 S.W.2d 685, 691 (Mo.App. 1993), the Slones incorporated the entire chronology of the Slones' dealings with Purina, including the Slones' actions and Purina's representations and promises prior to the Swift–Eckrich contracts, and specifically assert that Purina represented that the Slones would be selling turkey feed to turkey growers under Purina's expanding turkey market in Miller County."

Based on this statement, the Slones' attempt to incorporate statements made in 1978 by Walt Reece, Purina's Territory Manager, encouraging the Slones to expand their business by moving from their farm to a mill they could purchase (which they did) in order to take advantage of the turkey feed market Purina was going to create by placing turkeys in Miller County. Though these alleged facts were not contained in the Slones' pleadings, their pleading was sufficient to satisfy the requirements of Rule 55.15 and Reece's alleged statements did become part of the record of this case through the Slones' deposition and, therefore, can be considered when reviewing the propriety of a summary judgment motion.[6] Based upon these representations, the Slones claim they purchased the mill and two feed delivery trucks, incurring approximately $200,000 in debt. The Slones then go on to discuss Bray's statement on several occasions that Purina would not sell turkey feed directly to Miller County farmers and their alleged reliance on these statements to purchase the delivery trucks, a soybean extender, and a fat addition machine between 1984 and fall 1986 as the turkey feed business expanded. Even after Danny overheard talk of direct sales at a meeting in Hawaii, Bray continued to assure Danny that "[w]e (Purina) will never go direct, Danny.

We need you. As long as I am here, we will never sell direct." The Slones then discuss Bray's statements regarding the handling of the feed under the pass-through contract being the same as it was handled under the prior contracts. It is these final statements that the trial court incorrectly focused solely upon.

■ Having concluded that more than Bray's statements with regard to the Swift–Eckrich pass-through contract were encompassed by the Slones' fraudulent misrepresentation claim, we turn to an analysis of the deficiencies the trial court found in the claim. First, we look at the trial court's finding that Bray's statements were not "material," essentially finding that Bray's statements were not statements of fact. A claim of fraudulent misrepresentation must be based upon a representation that is a statement of fact and not mere statements of opinion, expectations, and predictions for the future. *Watkins v. Gross*, 772 S.W.2d 22, 24 (Mo.App.1989).

Purina took the position that the alleged statements of Reece and Bray were nothing more than statements of opinion, citing *Richmeyer v. Sugar Creek Builders, Inc.*, 856 S.W.2d 382 (Mo.App.1993), in support of its argument. In *Richmeyer*, plaintiffs signed a contract with defendant to build a home. Larry Thompson held a one-half ownership in the defendant company. As part of the contract, plaintiffs paid $2,000 earnest money and $11,165 additional earnest money at the time of the loan. Plaintiffs asked Thompson if the earnest money could be placed in escrow and were told that it could not and "[d]on't worry about your money." Shortly thereafter a creditor froze defendant's assets and defendant was unable to perform its obligations under the contract.

The trial court entered judgment for plaintiffs on their claim of fraud against Thompson. The Eastern District Court of Appeals reversed the trial court, finding that Thompson's statements were not statements of fact; at most, they were statements of opinion that were not actionable. 856 S.W.2d at 384. In

---

**6.** The trial court's initial judgment is founded on *the record submitted and the law. ITT Commercial Fin.*, 854 S.W.2d at 376. As noted, the submitted record included the Slones' deposition testimony referencing the statements made by Reece.

this same vein, Purina claims that the statements of Reece and Bray were no more than statements of opinion and not actionable.

We are not persuaded by Purina's argument. The statements of Reece and Bray are much more specific than the vague "[d]on't worry about your money" announcement in *Richmeyer*. Reece told Danny that Purina needed to get into the turkey business, and that Purina would support Danny in getting in the business. Bray continuously told the Slones that Purina would not sell directly to Miller County farmers. Opfer initially told the Slones the feed handling under the pass-through contracts would be carried out just as it had been under prior contracts. These statements, made based on their superior knowledge of Purina's intended actions and their own experience in the feed business, are more than statements of opinion and are "material." The trial court erred in finding otherwise.

■ Second, the trial court concluded that the Slones did not err to their detriment on the statements of Bray with regard to the Swift–Eckrich pass-through contracts, therefore, their fraudulent misrepresentation claim failed as a matter of law. We have already addressed the error of the trial court in taking too limited a view of the Slones' claim. The Slones' fraudulent misrepresentation claim encompasses the entire chronology of their dealings with Purina. Viewing the record in the light most favorable to the Slones, it is clear that the detrimental reliance aspect of the fraud claim is satisfied by the purchase of the feed mill, feed delivery trucks, and equipment necessary to service the turkey farmers. The trial court erred in finding that the Slones failed to show detrimental reliance on the statements of Purina representatives.

■ Third, the trial court found that the Slones' fraudulent misrepresentation claim failed because any reliance by the Slones on Bray's statements would not be reasonable as a matter of law because the Sales and Distribution Policy provided that there might be circumstances in which feed sales would not be made through the dealership. In Missouri, in an action for fraud, it is for a jury to decide whether a party is entitled to rely on verbal representations that conflict with a written agreement. *Jacobs Mfg. Co. v. Sam Brown Co.*, 19 F.3d 1259, 1264 (8th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 487, 130 L.Ed.2d 399 (1994), and *cert. denied*, —— U.S. ——, 115 S.Ct. 1251, 131 L.Ed.2d 133 (*citing Essex v. Getty Oil Co.*, 661 S.W.2d 544, 549 (Mo.App.1983). Consequently, the Slones' reliance on the statements of Reece, Bray, and/or Opfer could be justified, even though they might be contradictory to some terms in the Sales and Distribution Policy. The trial court erred in finding that the Slones' fraudulent misrepresentation claim failed as a matter of law on this element. Consequently, the Slones' claim sufficiently satisfies the elements of a fraudulent misrepresentation claim for the purposes of summary judgment analysis.

■ The question remains, however, as to whether the Slones waived their fraudulent misrepresentation claim. The trial court concluded that by entering into the service fee agreement, the Slones waived their right to sue for fraud. In assessing this argument, we must first recall our standard of review. Purina has not established a right to summary judgment by showing facts that negate any one of the Slones' facts required to establish an element of their claim nor has Purina established that the Slones have not and will not be able to produce evidence for the trier of fact to find the existence of any one of the elements of their claim. Therefore, Purina must show that there is no genuine dispute as to the existence of each of the facts necessary to support the movant's *properly-pled* affirmative defense, in this case waiver. *See ITT Commercial Fin.*, 854 S.W.2d at 381. Purina did not plead the affirmative defense of waiver to the Slones' fraudulent misrepresentation claim in its answer or amended answer and did not allege the facts necessary to support its affirmative defense. The trial court erred in determining otherwise.

The trial court erred in granting Purina's motion for summary judgment on the Slones' fraudulent misrepresentation claim, as viewed in the light most favorable to the Slones, there were "material" statements

from Purina representatives that they could reasonably rely on, even in contradiction to the Sales and Distribution Policy, and there was detrimental reliance on those statements by the Slones. Additionally, Purina failed to plead the affirmative defense of waiver; consequently, the trial court could not rely on this defense to grant Purina's motion.

## II. *PURINA'S CROSS–APPEAL*

Purina next appeals the trial court's denial of its motion for summary judgment as to the Slones' claim of tortious interference with a business expectancy related to the Bilmar contracts. Denial of a motion for summary judgment is not a final judgment and, therefore, not reviewable by this court. *Davis v. Davis*, 908 S.W.2d 163, 164 (Mo. App.1995); *State ex rel. Missouri Div. of Transp. v. Sure–Way Transp., Inc.*, 884 S.W.2d 349, 351 (Mo.App.1994). Though we are of the belief that the trial court was correct in denying Purina's summary judgment motion on this count, that issue is not properly before this court. Point denied.

## III. *CONCLUSION*

With regard to the Slones' appeal, the order of the trial court granting Purina summary judgment on the Slones' claim of tortious interference with a business expectancy relating to the Swift–Eckrich pass–through contracts is affirmed. The portions of the order granting Purina summary judgment as to the Slones' claims of breach of contract and fraudulent misrepresentation are reversed. Though we believe Purina's cross–appeal is without merit, the issue is not subject to review by this court.

All concur.